UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Luis A. Urenda-Bustos, | Case No. 2:18-cv-01073-JCM-DJA |
| Petitioner | Order Granting Petition for Writ of Habeas Corpus and Certificate of Appealability. |
| v. | |
| Ronald Oliver,[1] et al., | |
| Respondents | |

Petitioner Luis A. Urenda-Bustos was convicted by a jury and sentenced to an aggregate of 10 years to life imprisonment for conspiracy to commit kidnapping, first-degree kidnapping with use of a deadly weapon, robbery with use of a deadly weapon, extortionate collection of debt, and trafficking in a controlled substance. ECF No. 29-24. This matter is before the court for adjudication on the merits of the remaining grounds[2] of Urenda-Bustos's counseled fourth-amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 ("petition") ( ECF No. 52).

In the petition, Urenda-Bustos alleges he received ineffective assistance from the attorney who represented him for his trial and appeal in violation of the Sixth and Fourteenth Amendments. In particular, he alleges in ground 3(B)(4) that appellate counsel rendered ineffective assistance by failing to pursue a preserved claim that the trial court erred in overruling the defense objection under *Batson v. Kentucky*, 476 U.S. 79 (1986) that the state engaged in purposeful race discrimination by exercising peremptory challenges against, among others, African-American venireperson Sharee Nock. ECF No. 52 at 64–66. The state supreme court's determination that appellate counsel was not ineffective in failing to pursue the *Batson* claim in ground 3(B)(4) is, by clear and convincing evidence, based on an unreasonable determination of fact in light of the evidence presented in the state court's proceedings. 28 U.S.C. § 2254(d)(2), (e)(1). Applying de

---

[1] According to the state corrections department's inmate locator page, Urenda is incarcerated at Southern Desert Correctional Center. The department's website reflects Ronald Oliver is the warden for that facility. Southern Desert Correctional Center Facility | Nevada Department of Corrections (nv.gov). At the end of this order, the court directs the clerk to substitute Ronald Oliver for respondent Jerry Howell, under, *inter alia*, Fed. R. Civ. P. 25(d).

[2] This court previously granted the respondents' motion to dismiss ground 1 of the petition. ECF No. 67.

novo review, this court finds appellate counsel's failure to pursue the *Batson* claim for the state's peremptory challenge of venireperson Nock was deficient and prejudicial under *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000) and *Strickland v. Washington*, 466 U.S. 668 (1984). For the reasons discussed below, this court grants a writ of habeas corpus on ground 3(B)(4); denies grounds 2(A)–2(J), 3(A), 3(B)(1)–(3), 3(C), 3(E) and 3(G); dismisses grounds 3(D) and 3(F) as procedurally defaulted, grants a certificate of appealability for grounds 2(A)–2(C), and 3(B)(1)–(3), vacates the judgment, and reverses and remands for a new trial.

I.      Background[3]

      *A.      Urenda-Bustos and two other men kidnapped Eduardo Cadena-Ambario.*

Eduardo Cadena-Ambario knew Urenda-Bustos (as "Martin") for about three years and lived with Urenda-Bustos and Mario Alberto Gamboa-Cruz in Las Vegas, Nevada for about three months. ECF Nos. 29-17 at 4–5; 29-18 at 11. During that time, Cadena-Ambario borrowed a tire from Urenda-Bustos, and a dispute arose between them over Cardena-Ambario's failure to pay rent and who was responsible for paying for traffic tickets. ECF Nos. 29-17 at 5; 29-18 at 12, 15, 18. Cadena-Ambario threatened to tell the police that Urenda-Bustos and Gamboa-Cruz sold drugs at the house, and Urenda-Bustos and Gamboa-Cruz permitted Cadena-Ambario to move out, take his vehicle and two changes of clothes, but kept his other belongings. ECF No. 29-18 at 15, 18.

About two months later, on September 6, 2010, Cadena-Ambario received a voicemail from Urenda-Bustos:

> Son-of-a-bitch. Motherfucker. Hey, Dick, I'm waiting for you to bring me my tire dude. [I] don't want to go with you—for me to go look for you and fuck you up, dude. I can't find you. I'm going to go to your uncle's, and I'm going to take it out on him. You hear, asshole. I need my tire, you son-of-a-bitch. Son-of-your-fucking-bitch mother. You don't know how it[']s going to end up for you, dumb ass.

ECF No. 29-19 at 43. That night, Urenda-Bustos, Gamboa-Cruz, and Carlos Lopez-Lauro (known to Cadena-Ambario as "Van") approached Cadena-Ambario outside his new residence and Urenda-Bustos asked for his tire. ECF No. 29-17 at 5–6. Cadena-Ambario agreed, but Urenda-

---

[3] The court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court record. The court summarizes the same as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the court overlooked it in considering Urenda-Bustos's claims.

Bustos then asked for the title and keys to Cadena-Ambario's vehicle. *Id.* Cadena-Ambario pulled out his phone to dial 911, but before he could complete the call, Gamboa-Cruz hit him with his fist on Cadena-Ambario's mouth and then all three of the men hit Cadena-Ambario. *Id.* at 6. Gamboa-Cruz also hit Cadena-Ambario on the forehead and in the back of his head with a firearm, causing the front and back of Cadena-Ambario's head to bleed. *Id.* at 6–7, 10. The men were pushing Cadena-Ambario, and he hit his house window. *Id.* at 7. His new roommate, Rodolfo Alvarez, was inside, heard something hit his window, opened his blinds, and saw three men struggling to put Cadena-Ambario into a vehicle. ECF No. 29-18 at 29–30. Cadena-Ambario testified the three men forced him into the back of a van, covered his face, and Lopez-Lauro sat a top him. ECF No. 29-17 at 8–9. Gamboa-Cruz told Cadena-Ambario three or four times that they were going to kill him and drop him off in the desert. *Id.* Meanwhile, Alvarez called the police. ECF No. 29-18 at 30.

Urenda-Bustos drove to his residence (where Cadena-Ambario had previously lived with Urenda-Bustos and Gamboa-Cruz) and the men forced Cadena-Ambario to sit on a chair inside the kitchen, removed the head cover, and Gamboa-Cruz tied Cadena-Ambario's hands behind his back with a zip tie. ECF No. 29-17 at 8–10. Gamboa-Cruz threatened to kill Cadena-Ambario and Cadena-Ambario's uncle. ECF No. 29-18 at 8–10, 16. Gamboa-Cruz and Lopez-Lauro took Cadena-Ambario's vehicle keys, wallet, and phone. ECF No. 29-17 at 10. Cadena-Ambario's head was bleeding, and he was afraid the men would kill him, so he told Urenda-Bustos he could have his car. *Id.* Urenda-Bustos directed Gamboa-Cruz and Lopez-Lauro to retrieve Cadena-Ambario's vehicle, but they returned without it as the police were already at Cadena-Ambario's house. *Id.* at 10–11. Gamboa-Cruz and Lopez-Lauro thereafter left the house with "bags, like clothing." *Id.*

**B.    *Urenda-Bustos and his girlfriend hid firearms and drugs from police.***

Cadena-Ambario testified he saw Urenda-Bustos pull out "little packages of marijuana" from a kitchen door and place them on the counter and remove "small black bags" from a box in the living room that Cadena-Ambario assumed, but was not certain, contained methamphetamine, and that Urenda-Bustos was "putting everything away in his pockets." ECF Nos. 29-17 at 11; 29-18 at 4, 13, 20. Cadena-Ambario saw Urenda-Bustos give two rifles to Urenda-Bustos's girlfriend,

Malriz Bonifacio, and saw her leave, but Cadena-Ambario did not see Urenda-Bustos give her drugs or see a backpack. ECF Nos. 29-17 at 11; 29-18 at 13.

Bonifacio testified that she saw Cadena-Ambario in the kitchen with a bloody forehead and Urenda-Bustos told her Cadena-Ambario "got beat up by somebody." ECF No. 29-18 at 32–35. About 10 minutes later, Urenda-Bustos told her she better "get the rifles out of here," and she saw him place drugs and $4,000 in her backpack. *Id.* at 33, 37. She placed the rifles in the trunk of a car while Urenda-Bustos placed the backpack in the front passenger seat, and Bonifacio drove the car to her mother's house. *Id.* at 33, 37–38. Gamboa-Cruz, whom she knew as "Beto" later picked up the vehicle containing the rifles, and her backpack containing drugs and money. *Id.* at 34–35, 38. At trial, Bonifacio identified a photograph of the drugs, which the police later found inside her backpack at Urenda-Bustos's residence, as the same drugs she saw Urenda-Bustos place in her backpack. *Id.* at 36. She claimed she never saw methamphetamine at his house before then. *Id.* at 36, 38. Bonifacio pleaded guilty to accessory to kidnapping under a plea agreement that required her cooperation and trial testimony. *Id.* at 37.

C.    *Cadena-Ambario was released and identified his assailants.*

After Gamboa-Cruz, Lopez-Lauro, and Bonifacio left the residence, Urenda-Bustos removed the zip-tie from Cadena-Ambario's wrists, because Cadena-Ambario told him his hand was bleeding; however, Urenda-Bustos retied Cadena-Ambario's wrists in front of Cadena-Ambario's body using a shoelace. ECF Nos. 29-17 at 11–12; 29-18 at 3. Urenda-Bustos subsequently removed the shoelaces from Cadena-Ambario's wrists and gave him a clean t-shirt because the shirt that Cadena-Ambario's wore was "full of blood." ECF No. 29-18 at 4–5. Urenda-Bustos returned Cadena-Ambario's wallet and phone, but not the vehicle key, and took Cadena-Ambario in Urenda-Bustos's gold-colored (Buick) vehicle to Cadena-Ambario's house, but the police were there, so he dropped Cadena-Ambario off at a nearby restaurant. *Id.* at 6, 16.

Officer Carmen Tirado of the Las Vegas Metropolitan Police Department ("Metro") responded to Alvarez's call and saw Cadena-Ambario return to his residence "covered in blood," with a "large gash on his forehead." ECF No. 29-19 at 4–6. Later that day, Cadena-Ambario took Metro robbery Detectives Jason Nelson and Elias Cardenas to his assailants' current and former

4

addresses and identified Urenda-Bustos's gold-colored Buick vehicle parked at Urenda-Bustos's house. *Id.* at 26–28. Cadena-Ambario supplied the detectives with a piece of paper bearing the suspect names Luis Urenda-Bustos and Luis Alvarado-Guerro, but the detectives could find no information on Urenda-Bustos through local databases. *Id.* at 30.

Two days later, Metro homicide detectives informed Detective Nelson that Urenda-Bustos and Gamboa-Cruz were in custody after having been stopped after leaving Urenda-Bustos's residence. ECF No. 31-5 at 28. Detectives Nelson and Cardenas picked up Urenda-Bustos for questioning. *Id.* at 28–29. Detective Nelson snapped a photograph of Urenda-Bustos after arresting him and Cadena-Ambario later identified Urenda-Bustos as one of his assailants based on that photograph. *Id.* Cadena-Ambario identified the other two assailants as Gamboa-Cruz and Lopez-Lauro based on photographic lineup arrays. *Id.* at 30–32.

> **D.** *Urenda-Bustos confessed to kidnapping Cadena-Ambari, hitting him with a firearm, and attempting to extort payment for debt.*

Following warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966), Urenda-Bustos told robbery Detective Cardenas that he, Gamboa-Cruz, and Lopez-Lauro, followed his ex-roommate, Cadena-Ambario, to Cadena-Ambario's house in Lopez-Lauro's van because Cadena-Ambario didn't pay bills and took a tire. ECF No. 29-19 at 44–45. Urenda-Bustos said he asked Cadena-Ambario for the tire and $600 but Cadena-Ambario refused. *Id.* at 45–46. Urenda-Bustos said he asked for the title to Cadena-Ambario's vehicle until Cadena-Ambario could pay. *Id.* He said they argued, Urenda-Bustos hit Cadena-Ambario with a heavy black BB gun, and then Gamboa-Cruz (known to Urenda-Bustos as "Alberto") hit Cadena-Ambario a second time. *Id.* Urenda-Bustos said he instructed Gamboa-Cruz to dispose of the gun. *Id.* Urenda-Bustos said he told Cadena-Ambario he was going to "F" him up bad, instructed Gamboa-Cruz and Lopez-Lauro (whom Urenda-Bustos knew as "Noel") to hold Cadena-Ambario in the van, and that Lopez-Lauro sat on top of Cadena-Ambario. *Id.* at 47.

Urenda-Bustos told Detective Cardenas they took Cadena-Ambario to Urenda-Bustos's residence, seated him in a chair in the kitchen, and Gamboa-Cruz tied Cadena-Ambario's hands behind his back with a zip tie. ECF No. 29-19 at 47. Urenda-Bustos asked Cadena-Ambario how

he would pay his debt, and Cadena-Ambario offered his vehicle title. *Id.* Urenda-Bustos sent Gamboa-Cruz and Lopez-Lauro to obtain the vehicle title or vehicle. *Id.* Urenda-Bustos directed Gamboa-Cruz and Lopez-Lauro to search Cadena-Ambario's pockets and they took Cadena-Ambario's wallet and cellphone but not his keys. *Id.* Gamboa-Cruz and Lopez-Lauro returned without the vehicle or its title because the police were at Cadena-Ambario's home, and they returned Cadena-Ambario's wallet and cellphone. *Id.* at 48. Urenda-Bustos said he instructed Bonifacio to take three rifles out of the house because he was afraid the police would find them. *Id.* Urenda-Bustos cut off the zip tie and tied Cadena-Ambario's hands with a shoelace. *Id.* He dropped Cadena-Ambario around the corner from Cadena-Ambario's house. *Id.* He admitted threatening to kill Cadena-Ambario because he was mad. *Id.*[4]

  E. *Cadena-Ambario's blood was found inside the minivan and Buick.*

  On the afternoon of Urenda-Bustos's arrest, Detective Nelson obtained a warrant to seize Urenda-Bustos's Buick and Lopez-Lauro's minivan to search for a firearm and DNA evidence. ECF No. 31-5 at 78–86. Metro Senior Crime Scene Analyst Randall McPhail found "a lot of blood" inside and on the outside of the minivan and took samples for DNA analysis. ECF No. 29-19 at 8–10. He also took a portion of the passenger headrest from the Buick for analysis. *Id.* at 11–12. Metro Forensic Scientist Jennifer Thomas with the DNA unit matched Cadena-Ambario's DNA to blood in the minivan and the headrest for the Buick. ECF No. 29-19 at 37.

  F. *During the execution of a warrant for an unrelated homicide investigation police found methamphetamine and Cadena-Ambario's blood in Urenda-Bustos's house.*

  While Metro robbery Detectives Nelson and Cardenas investigated the crimes committed against Cadena-Ambario, Metro homicide officers were investigating Gamboa-Cruz as a suspect for the July 2010 murder of Romel Valdovinos, whose body was found in the desert. ECF No. 31-5 at 68. Valdovinos's hands were bound behind his back with a white plastic zip tie, and he was shot in the head. *Id.* Valdovinos's telephone last contacted a telephone number registered to Gamboa-Cruz. *Id.* Police subpoenaed Gamboa-Cruz's telephone records, which revealed that on

---

[4] Urenda-Bustos's translated interview transcript was admitted as evidence at trial. ECF No. 29-19 at 43–45.

the night of Valdovinos's death, Gamboa-Cruz's telephone was in the area where Valdovinos's body was later discovered. *Id.*

About two days after Cadena-Ambario told the robbery detectives that Gamboa-Cruz was one of his assailants and identified Urenda-Bustos's residence, Metro homicide detectives obtained a search warrant for (1) Urenda-Bustos's house (because they believed Gamboa-Cruz may reside there and that evidence of the Valdovinos homicide could be found there), (2) a second address that Gamboa-Cruz texted to another individual on the day after Valdovinos was found and which matched Gamboa-Cruz's vehicle registration; and (3) Gamboa-Cruz's Ford vehicle. *Id.* at 63–69.

During the execution of the search warrant at Urenda-Bustos's residence for the homicide investigation, Metro Senior Crime Scene Analyst Shayla Joseph impounded for DNA analysis two shirts with apparent blood on them; a chair with apparent blood on the back of it; and a shoelace with a reddish-brown stain. ECF No. 29-19 at 16–17. At Detective Nelson's direction, Joseph impounded keys found outside the residence, and a zip tie that Urenda-Bustos told Detective Cardenas could be found in the garbage can outside Urenda-Bustos's residence. *Id.* at 17–18, 32. Metro Forensic Scientist Jennifer Thomas testified that Cadena-Ambario's blood was identified on the two shirts, chair, and zip tie. *Id.* at 35–40.

Metro Narcotic Officer Cletus Meegan impounded two small clear plastic bags of presumptive methamphetamine and a third bag of what he assumed was a "filler" that might be added to methamphetamine to "stretch" the quantity. ECF No. 29-18 at 21–25. One of the small bags (containing a set of small bags) was found in a sports bag (backpack); the second small bag was in a kitchen cabinet; and the third bag was found under the kitchen sink. *Id.* Metro Forensic Scientist David Gouldthorpe testified the three bags contained a net weight of 47.77 grams, 19.90 grams, and 40.53 grams (a total of 108.2 grams), of a substance containing methamphetamine, but the larger bag did not contain controlled substances. *Id.* at 27–29.

II.    Legal Standards

A.    AEDPA Standard of Review

AEDPA sets forth the standard of review generally applicable to claims contained in habeas corpus petitions:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). State courts are not required to be aware of or cite Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). "State-court decisions are measured against [the Supreme Court]'s precedents as of 'the time the state court renders its decision.'" *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (quoting *Lockyer*, 538 U.S. at 71–72).

A state court's decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10, 412) (internal citation omitted).

"[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary

conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75). *See also Cullen*, 563 U.S. at 181 (describing the standard as a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

Under 28 U.S.C. § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). AEDPA requires federal courts to "accord the state trial court substantial deference." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). "The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply *de novo* review of factual findings and to substitute its own opinions for the determination made on the scene by the trial judge." *Davis v. Ayala*, 576 U.S. 257, 276 (2015) (internal quotation marks and citations omitted). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the [state] court's . . . determination." *Id.* (internal quotation marks and ellipsis omitted) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

"Under § 2254(e)(1), 'a determination of a factual issue made by a State court shall be presumed to be correct,' and the petitioner 'shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Wood*, 558 U.S. at 293. The Supreme Court has not, however, provided a fuller explanation of the relationship between § 2254(d)(2) and (e)(1), for purposes of a federal habeas court's review of a state court's determination of fact. *See id.* at 300 (holding that, because the state court's factual determinations were not unreasonable under the standard set forth in § 2254(d)(2), the Supreme Court need not decide whether the determination should be reviewed under the arguably more deferential standard set out in section § 2254(e)(1)). *See also Murray v. Schriro*, 745 F.3d 984, 998–1001 (9th Cir. 2014) (acknowledging the Supreme Court has failed to address the relationship between § 2254(d)(2) and § 2254(e)(1) and noting tensions within the ninth circuit cases or between ninth

circuit cases and limited statements by the Supreme Court will have to be resolved by the ninth circuit en banc or by the Supreme Court). *But see Apelt v. Ryan*, 878 F.3d 800, 837 n.23 (9th Cir. 2017) (noting it is "difficult to imagine a case in which a court would find that a state court decision was 'an unreasonable determination of the facts,' but that the petitioner had not rebutted the 'presumption of correctness by clear and convincing evidence.'").

### B.   Ineffective-Assistance-of-Counsel (IAC)

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). An IAC claim requires that a petitioner show (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687–88, 694. To prevail on a claim that appellate counsel was ineffective, a petitioner must show (1) appellate counsel "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and (2) "a reasonable probability that, but for his counsel's [unreasonable performance], he would have prevailed on his appeal." *Smith*, 528 U.S. at 285–86.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112; *Cullen*, 563 U.S. at 189. Petitioners bear the burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687–88. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

Petitioners making an IAC claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. When considering an IAC claim, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant

must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689. A court is obliged to "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. On the deficiency prong, the issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his perspective at the time. *See id.* at 689–90. Although IAC claims are examined separately to determine whether counsel was deficient, "prejudice may result from the cumulative impact of multiple deficiencies." *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978)).

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *Harrington*, 562 U.S. at 105 (internal citations omitted). *See also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'") (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

III.   Discussion

Urenda-Bustos claims he received ineffective assistance of trial counsel (ground 2) and appellate counsel (ground 3), in violation of the Sixth and Fourteenth Amendments.[5]

> A.   *Ground 2(A)—The Supreme Court of Nevada was reasonable in its application of Strickland and determination that trial counsel was not ineffective in failing to move to suppress evidence based on a theory that a warrant to search Urenda-Bustos's residence for evidence of a homicide was used as a pretext to search for evidence of the crimes committed against Cadena-Ambario.*

Urenda-Bustos alleges trial counsel was ineffective in failing to move to suppress evidence based on a claim that the warrant authorizing the search for and seizure of evidence for the homicide investigation at Urenda-Bustos's residence was used as a pretext to obtain evidence of the crimes committed against Cadena-Ambario. ECF No. 52 at 11–25. He alleges there is a reasonable probability the evidence would have been suppressed and therefore he would not have

---

[5] The court subdivides certain claims for purposes of clarity and ease of reference.

been convicted of the trafficking and robbery offenses. ECF Nos. 52 at 24; 89 at 24–25. The respondents contend that Urenda-Bustos fails to demonstrate the state supreme court's holding is contrary to or involved an unreasonable application of clearly established federal law or is based on an unreasonable determination of fact. ECF No. 78 at 17–18. They contend the officers were lawfully authorized to seize evidence of other crimes discovered during the execution of the warrant for evidence of the homicide and that Urenda-Bustos failed to establish the warrant was a pretext to search for evidence of other crimes. *Id.*[6]

### 1.   Additional Background

A search warrant was issued to search Gamboa-Cruz's vehicle, and two residences associated with him, including the residence of Urenda-Bustos. ECF Nos. 31-5 at 63–76. The warrant authorized seizure of the following items of evidence for the investigation of the Valdovinos homicide:

1.  Paperwork, such as rent receipts, utility bills and addressed letters showing the names of persons residing at the premises. Paperwork such as proof of insurance, DMV registration showing the names of persons owning, responsible for the vehicles.

2.  Written correspondence, diaries, financial records, wills and like items.

3.  Items of value, such as jewelry, watches, money, credit cards, identification and like items, including receipts for the same.

4.  Photographs, video and/or audio tapes, or discs, cellular phones, desk top and/or laptop computers.

5.  Telephonic information to include caller I.D. history, answering machine messages, phone directories, call history, photographs and/or video stored electronically in residential or cellular phones.

6.  A thorough, microscopic examination and documentation of the crime scene to discover trace evidence to include but not limited to, fingerprints, blood, hair, fibers and bodily fluid samples.

7.  Epithelio cells from the mouth of Mario Alberto Gamboa-Cruz, date of birth . . . to be collected via buccal swab.

8.  Firearms and ammunition or weapons associated with the crime of murder, and associated paperwork for the firearms.

---

[6] The respondents contend this court may not consider the state's response to defendant Gamboa-Cruz's motion to suppress statements (ECF No. 20-5). ECF No. 78 at 20. This court may do so because it is part of the state court record (ECF No. 31-9 at 35–40). *See Cullen*, 563 U.S. at 180–81 (holding deferential review of the merits of a federal habeas corpus claim are decided on the record that was before the state court when it adjudicated the claim).

9.   Zip ties, and victim's keys, and cellular telephone, and gloves.

ECF No. 31-5 at 67–68.

The police seized two bloody shirts, a chair with blood on it, a shoelace with a reddish-brown stain on it, a zip tie, and a Ford vehicle key. ECF Nos. 29-19 at 16–19; 31-5 at 72–74. Police found on top of a dresser in a bedroom an identification bearing the name "Luis Aurelio Urenda." ECF Nos. 29-19 at 20–21; 31-5 at 73. They found a backpack on top of a cabinet next to that dresser. ECF No. 29-19 at 15. Items in the backpack included Bonifacio's high school identification, two clear plastic bags containing a white crystalline substance, and $3,505 in cash. *Id.* at 15–16, 20. Inside that dresser, police found documents belonging to multiple individuals: (1) Nevada Energy bills for two addresses, including the residence searched, and a receipt bearing the name of Luis Urenda-Bustos; (2) a passport and social security card in the name of Trinidad Gonzalez; and (3) permanent residence and social security cards in the name Griselda Rosales Gomez. ECF Nos. 29-19 at 16–17, 20–21; 31-5 at 73. Elsewhere in the residence, police found (1) a bag containing a mixture of methamphetamine in a kitchen cabinet; (2) a bag of adulterant ("filler") under the kitchen sink; (3) paperwork in the name of Mario Gamboa-Cruz; (4) a payroll receipt and social security card in the name of Jose Luis Hernandez-Sanch; (5) a driver's license for Barbara Gaughan; (6) a social security card for Raymundo Giovanni-Mendoza; (7) a permanent residence card for Raymundo Mendoza-Crus; (8) social security cards for Martin Negrete, Jr. and Daniel Trevino; and (9) a birth certificate for Daniel Trevino. ECF Nos. 29-18 at 21–22, 27–29; 29-19 at 17, 21; 31-5 at 72–74.

2.   *Applicable Legal Principles*

The Fourth Amendment of the Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. *See Horton v. California*, 496 U.S. 128, 133 (1990). To prevail on an IAC claim predicated on the failure to file a motion to suppress evidence, a petitioner must establish, not only that counsel was ineffective under *Strickland*, but that the Fourth Amendment claim has

merit and there is a reasonable probability the jury would have reached a different verdict absent the excludable evidence. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

"Search warrants are not directed at persons; they authorize the search of 'place[s]' and the seizure of 'things,' and as a constitutional matter they need not even name the person from whom the things will be seized." *Zurcher v. Stanford Daily*, 436 U.S. 547, 555 (1978). Thus, "[v]alid warrants may be issued to search *any* property, whether or not occupied by a third party, at which there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found." *Id.* at 554. "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the [warrant] requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (footnote omitted).

The ninth circuit court of appeals has thus held that a "[a] search warrant for the entire premises of a single[-]family residence is valid, notwithstanding the fact that it was issued based on information regarding the alleged illegal activities of one of several occupants of a residence." *United States v. Ayers*, 924 F.2d 1468, 1480 (9th Cir. 1991). "[A] warrant is valid when it authorizes the search of a street address with several dwellings if the defendants are in control of the whole premises, if the dwellings are occupied in common, or if the entire property is suspect." *United States v. Alexander*, 761 F.2d 1294, 1301 (9th Cir. 1985). In *Ayers*, the ninth circuit court of appeals explained that items authorized to be seized under the warrant, i.e., a drug dealer's narcotics and related paraphernalia, were likely to be found in "any portion of" his residence and although, "[t]he most obvious place for the police to search would be the drug dealer's bedroom," "[a]ny other portion of the house would be a more secure hiding place." *Id.* at 1480. The circuit upheld the search of an entire premises, including a bedroom belonging to an individual who was not the subject of the warrant, finding the search was not overbroad or unreasonable under the circumstances. *See id.* at 1479–80.

The warrantless seizure of evidence of a crime discovered in plain view is not prohibited by the Fourth Amendment. *See Horton*, 496 U.S. at 130. "An example of the applicability of the

'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." *Id.* at 135 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971)). "The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement." *Id.* at 138–39 ("If [an officer] has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, we fail to see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first.").

To satisfy the plain view doctrine: (1) the officer must be lawfully in the place where the seized item was in plain view; (2) the item's incriminating nature must be "immediately apparent[;]" and (3) the officer must have "a lawful right of access to the object itself." *See Horton*, 496 U.S. at 136–37 (citations omitted). The "incriminating character" of an object is "immediately apparent" if the officer has probable cause to believe the object is contraband, i.e., probable cause that the object is associated with criminal activity. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) ("The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point.").

"Police may search all items which legitimately might contain the objects specified in the warrant." *United States v. Disla*, 805 F.2d 1340, 1346 (9th Cir. 1986). *See, e.g., id.* (holding seizure of cocaine found in shopping bag and sock during execution of search warrant for "blue box," used to bypass billing system for long-distance telephone calls, was proper under plain view exception to warrant requirement, where warrant authorized search for blue box, and several other items including diagrams, directories, phone lists, or phone numbers, and items covered by warrant could reasonably be found in shopping bag or sock). *See also, e.g., United States v. Wong*, 334 F.3d 831, 834–35, 838 (9th Cir. 2003) (holding police not required to obtain a separate warrant for computer files that contained child pornography that were found during the execution of a warrant for a

murder investigation that permitted the search of the suspect's computers and disks to "obtain data as it relates to [a murder case]" because the child pornography was lawfully seized and admissible under the plain view doctrine: the police were lawfully in a position to view the computer files, the incriminating character was clear, and the police had a legal right to seize the files).

### 3.   Analysis of Ground 2(A)

The Supreme Court of Nevada determined that Urenda-Bustos did not establish trial counsel was ineffective in failing to move to suppress the evidence because Urenda-Bustos did not show the warrant was invalid, cite controlling authority establishing the search was pretextual, and the evidence would have been found regardless of whether the warrant was used as a pretext:

> [A]ppellant contends that the district court erred by denying his claims of ineffective assistance of counsel. To prove ineffective assistance of counsel, a petitioner must demonstrate that counsel's performance fell below an objective standard of reasonableness and a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Warden v. Lyons,* 100 Nev. 430, 432–33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*); *Kirksey v. State,* 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996) (applying the *Strickland* test to appellate counsel). In reviewing an ineffective-assistance claim, we start by presuming that an attorney's conduct is objectively reasonable because it could be considered part of a legitimate trial strategy. *Bullock v. Carver*, 297 F.3d 1036, 1047 (10th Cir. 2002). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. We give deference to the district court's factual findings but review the court's application of the law to those facts de novo. *Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).
>
> [A]ppellant contends that counsel should have filed a motion to suppress the evidence found at his home. Appellant argues that law enforcement used a warrant authorizing a search for evidence of a murder allegedly committed by his roommate as a pretext to search for evidence of the kidnapping. Appellant fails to demonstrate, however, that the warrant was invalid, and he points to no controlling authority supporting the assertion that evidence obtained pursuant to a "pretextual" but otherwise valid warrant must be suppressed. Moreover, the evidence would have been found regardless of whether the unrelated warrant was used as a pretext. Appellant therefore fails to demonstrate deficient performance or prejudice. We conclude that the district court did not err by denying this claim.
>
> > [FN 1] We also note that appellant was not prejudiced by failing to suppress evidence found regarding the attack and kidnapping because evidence of those crimes was overwhelming.

ECF No. 31-27 at 3–4.

The state supreme court was reasonable in its application of *Strickland* and its determination that Urenda-Bustos did not assert that the warrant was invalid or present evidence

to support such a claim.[7] The state supreme court was also reasonable in its determination that Urenda-Bustos cited no binding authority supporting his claim that the warrant was unlawfully used as a pretext to search for evidence of the crimes committed against Cadena-Ambario. As explained in the majority opinion in *Horton*, "[i]f [an officer] 'has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, we fail to see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first.'" *Horton*, 496 U.S. at 138–39.

Urenda-Bustos's pretext argument misapprehends the hypothetical used in the dissenting opinion in *Horton*, which posited, "if an officer enters a house pursuant to a warrant to search for evidence of one crime when he is really interested *only* in seizing evidence relating to another crime, for which he does not have a warrant, his search is 'pretextual' and the fruits of that search should be suppressed." *Horton*, 496 U.S. at 147 (Brennan, J., dissenting) (emphasis added). Unlike Justice Brennan's hypothetical, the record here does not suggest the homicide detectives were not at all looking for evidence of Valdovinos's murder, i.e., that their exclusive aim was to seize

---

[7] In his counseled reply brief, Urenda claims trial counsel was ineffective in failing to move to suppress the evidence on the grounds that the warrant was invalid for lack of probable cause because there was no nexus between Urenda-Bustos's residence and evidence of the Valdovinos murder. ECF No. 89 at 16–17. Urenda-Bustos did not present this claim in his petition (ECF No. 52) or during his initial state postconviction proceedings. *See* ECF Nos. 30-15 at 5; 31-1 at 8–13; 31-5 at 7–20; 31-9 at 4–12; 31-24 at 14–24; 31-26 at 6–14). The court notes that, even assuming arguendo that Urenda-Bustos raised this claim during the initial state postconviction proceedings, he did not seek leave to amend his petition to add this claim or contend this claim is technically exhausted by procedural default or that he can overcome a default under *Martinez v. Ryan*, 566 U.S. 1 (2012).

The court declines to consider new claims raised for the first time in a counseled reply brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). *See also Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("[r]eply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration."). *See id.* (holding that, because the non-moving party ordinarily has no right to respond to the reply brief, as a matter of litigation fairness and procedures, the new argument raised in the reply brief was necessarily treated as waived). *See also* Local Rule LR 7-2(b) ("Surreplies are not permitted without leave of court; motions for leave to file a surreply are discouraged.").

The court notes that, even assuming arguendo, the search warrant lacked probable cause to seize evidence pertaining to the Valdovinos murder at Urenda-Bustos's residence, there is no reasonable probability the evidence would have been suppressed because nothing in the state-court record shows the evidence was not seized in good faith reliance on the warrant. *See United States v. Leon*, 468 U.S. 897, 920 (1984) (holding evidence obtained by officers acting in reasonable reliance on a search warrant ultimately found to be unsupported by probable cause is admissible absent evidence the judge issuing the warrant lacked impartiality; the description of the place to be searched and items to be seized was inadequate; the affiant made material and intentional misrepresentations of fact; or the affidavit is so lacking in probable cause that no reasonable officer could think there was probable cause). Thus, even had Urenda-Bustos alleged the claim, it is without merit, and he could not overcome the procedural default of such a claim.

17

evidence related to the crimes against Cadena-Ambario. As Urenda-Bustos failed to establish a motion to suppress based on the pretext theory would have been granted, the state supreme court reasonably determined counsel was not ineffective in failing to move to suppress the evidence.

The state supreme court was also objectively reasonable in its determination that Urenda-Bustos failed to demonstrate deficient performance or prejudice because the evidence "would have been found regardless of whether the unrelated warrant was used as a pretext." The search warrant returns show the police seized items that they were authorized to seize under the warrant, i.e., blood on a chair, bloody shirts, a zip tie, a shoelace with reddish brown stains on it, and keys. ECF No. 31-5 at 72–74. Even assuming the homicide detectives were aware that those items could be evidence of the crimes committed against Cadena-Ambario, the record shows the items were lawfully seized as those items were listed in the warrant and might have constituted evidence of the Valdovinos homicide. *See supra* pp. 6–7, 12–13. The record also shows that the methamphetamine was lawfully seized from the kitchen and the backpack as they were discovered in plain view while officers searched for the items named in the warrant: the officers were lawfully in the residence, had a lawful right to search and seize evidence that could be contained inside cupboards and the backpack, and the incriminating nature of the items was immediately apparent. *Id. See Horton*, 496 U.S. at 136–37; *Wong*, 334 F.3d at 834–35; *Ayers*, 924 F.2d at 1479–80.

A motion to suppress the evidence lacked merit and therefore the state supreme court's application of *Strickland*, and determination that trial counsel's failure to file a motion to suppress the evidence seized under the warrant was neither deficient nor prejudicial, is objectively reasonable. *Kimmelman*, 477 U.S. at 375. Ground 2(A) is denied.

> B.   *Ground 2(B)—The Supreme Court of Nevada was reasonable in its application of Strickland and determination that trial counsel was not ineffective in failing to move to suppress evidence seized from a backpack in Urenda-Bustos's residence.*

Urenda-Bustos alleges trial counsel was ineffective in failing to move to suppress the methamphetamine seized from Bonifacio's backpack. ECF No. 52 at 25–29. He alleges the police were authorized to search only common areas and areas occupied by Gamboa-Cruz, they had no reason to believe that evidence of the homicide would be found in Urenda-Bustos's bedroom, and police were on notice that the bedroom containing the backpack belonged to Urenda-Bustos

because they found an identification bearing his name on the dresser. *Id.* He claims that, but for counsel's failure to move to suppress the evidence, he would not have been convicted of trafficking in a controlled substance. *Id;* ECF No. 89 at 25–33. The respondents contend the state supreme court reasonably applied *Strickland* as a motion to suppress the evidence would not have been successful because the warrant authorized the search, and even if the search was unlawful, the evidence would have been inevitably discovered, and Urenda-Bustos lacked standing to object to the items found in Bonifacio's backpack. ECF No. 78 at 20–21.

The Supreme Court of Nevada determined Urenda-Bustos did not demonstrate a motion to suppress the evidence seized from the backpack would succeed:

> [A]ppellant argues that counsel should have filed a motion to suppress drugs found in his bedroom. The unrelated warrant authorized law enforcement to search the entire home because evidence of the murder could have been anywhere in the home. *See* 2 Wayne R. LeFave, *Search and Seizure* § 4.5(b) (3d ed. 1996) (recognizing that when roommates share an apartment with separate unlocked bedrooms "whichever one of the [roommates] is responsible for the described items being in the apartment could have concealed those items anywhere within, including the bedrooms of his cotenants"). Because appellant fails to demonstrate that a motion to suppress on this ground would have been successful, *cf. State v. Quigley,* 892 A.2d 211, 217–18 (Vt. 2005) (holding that evidence was properly suppressed where the investigating officers were familiar with the layout of the apartment, knew how many tenants lived there, and knew that one of the residents had locked his bedroom and denied others access to it), he fails to demonstrate deficient performance or prejudice. We therefore conclude that the district court did not err by denying this claim.

> [FN 2] We reject appellant's claim that counsel should have moved to dismiss the trafficking charge for the same reasons.

ECF No. 31-27 at 4.

The search warrant authorized the search and seizure of evidence of the Valdovinos homicide that might be located inside the entire single-family residence, and nothing indicated the residence was subdivided into separate apartment dwellings. ECF No. 31-5 at 63, 66–71. It was thus reasonable for the homicide detectives, who were executing the warrant, to conclude that the items that were authorized to be seized under the warrant might be located inside the backpack and kitchen cabinets where the police found the methamphetamine. *See Ayers*, 924 F.2d at 1480 (holding police did not exceed the scope of the warrant by extending search to roommate's bedroom as the warrant authorized the search for narcotics throughout the entire single-family

residence). Under the plain-view doctrine, the police were authorized to seize the methamphetamine because they had the lawful right to access those areas of the residence, the lawful right to search the backpack and kitchen cabinets for the items named in the warrant, and the incriminating nature of the drugs was immediately apparent. *Horton*, 496 U.S. at 136–37.

Urenda-Bustos's claim that the execution of the warrant was overbroad because, without searching the backpack found in the bedroom, the police could readily ascertain from documents atop his dresser, that the bedroom did not belong to Gamboa-Cruz, is not supported by the record. The record indicates the name on the identification found on top of the dresser did not precisely match Urenda-Bustos's name; rather, the record indicates that identification bore the name "Luis Aurelo Urenda," and that the name "Luis Urenda-Bustos" was only found on energy bills and a receipt located inside that dresser. ECF Nos. 29-19 at 16, 20–21; 31-5 at 73. Even if that identification on the dresser bore Urenda-Bustos's name, the dresser, the backpack, and other parts of the residence, contained identification documents bearing a variety of names; thus, indicating the rooms of the residence were not exclusively occupied by any particular individuals. *See supra* p. 13. Even assuming the police could have ascertained the bedroom where the backpack was located was exclusively Urenda-Bustos's, nothing in the record indicates Urenda-Bustos's bedroom was inaccessible to Gamboa-Cruz as nothing indicates the bedroom that contained the backpack was locked at the time of the execution of the warrant. *See Ayers*, 924 F.2d at 1480.

Because the methamphetamine and cash were seized under the plain view doctrine, the state supreme court was reasonable in its application of *Strickland* and determination that trial counsel was not ineffective in failing to move to suppress those items as a motion to suppress them lacked merit.[8] *Kimmelman*, 477 U.S. at 375. Ground 2(B) is denied.[9]

---

[8] Urenda relies on *United States v. Mejia*, 69 F.3d 309, 320 (9th Cir. 1995), for his contention that the inevitable discovery doctrine does not apply, where, as here, the police had probable cause, but failed to obtain a warrant before searching the property. ECF No. 89 at 23. Reliance on *Mejia* is misguided. In *Mejia*, it was disputed whether the defendant consented to the search of his residence. Here, the evidence was seized under a warrant. Moreover, the state supreme court here did not deny Urenda's claims for Grounds 2(A) and 2(B) under the inevitable discovery doctrine; rather, for Ground 2(A) the state supreme court determined the evidence "would have been found regardless of whether the unrelated warrant was used as a pretext," e.g., because the evidence was discovered in plain view while searching for items authorized under the warrant.

[9] The parties dispute whether Urenda lacks standing to move to suppress the contents of his girlfriend's backpack. ECF Nos. 78 at 17, 20; 89 at 30–31. The state supreme court did not address that point and it is unnecessary

C. *Ground 2(C)—The Supreme Court of Nevada was reasonable in its application of Strickland and determination that trial counsel was not ineffective in failing to move for dismissal of the drug trafficking charge for lack of probable cause based on a supposition that the evidence seized from Urenda-Bustos's residence must be suppressed.*

Urenda-Bustos alleges that trial counsel was ineffective in failing to move for dismissal of the trafficking charges for lack of probable cause based on the supposition that the methamphetamine was unlawfully seized and must be suppressed. ECF No. 52 at 29–31. He contends that without the methamphetamine, the witness statements and testimony relating to drug trafficking, which he claims were derived from the seizure of the methamphetamine, were inadmissible as fruit of the poisonous tree. *Id.* Thus, he concludes that, based on trial counsel's failure to pursue a motion to suppress, the witness statements and testimony would have been suppressed, leaving no probable cause to hold him to answer to the trafficking offense. *Id.* The respondents contend there were no grounds to dismiss the trafficking charges for lack of probable cause as there was no meritorious motion to suppress the methamphetamine. ECF No. 78 at 22.

The Supreme Court of Nevada rejected "appellant's claim that counsel should have moved to dismiss the trafficking charge for the same reasons" why it rejected the claim that trial counsel was ineffective in failing to file a motion to suppress the methamphetamine found in the bedroom. ECF No. 31-27 at 4 n.2. The state supreme court's application of *Strickland* and determination that trial counsel was not ineffective in failing to pursue a motion to dismiss the trafficking charge for lack of probable cause is reasonable given that, as discussed, Urenda-Bustos raises no meritorious claim that trial counsel was ineffective in failing to move to suppress the methamphetamine. *See supra* at pp. 11–20. Ground 2(C) is denied.

D. *Ground 2(D)—The Supreme Court of Nevada was reasonable in its application of Strickland and determination that trial counsel was not ineffective in failing to file a pre-trial petition to dismiss the trafficking charge for lack of probable cause.*

Urenda-Bustos alleges trial counsel was ineffective in failing to file a pre-trial petition to dismiss the trafficking charge on the grounds the grand jury received insufficient evidence establishing probable cause to believe Urenda-Bustos possessed the methamphetamine found in

to do so here because, as discussed, even assuming arguendo that Urenda-Bustos has standing to challenge the search of the backpack, the evidence in the backpack was lawfully seized under the warrant and the plain view doctrine.

21

his residence. ECF No. 52 at 32–35. He claims Gamboa-Cruz succeeded with such a petition based on evidence of possession that is identical for Urenda-Bustos. *Id.*

### 1.   *Additional Background*

Metro Detective Nelson testified to the grand jury that Cadena-Ambario identified Urenda-Bustos's residence, and Urenda-Bustos's gold Buick parked in the driveway. ECF No. 29-3 at 11. He explained that the Buick displayed a for-sale sign bearing the same phone number Cadena had provided for Urenda-Bustos. *Id.* Metro narcotics Detective Meegan testified to the grand jury that police found at Urenda-Bustos's house a substance that tested positive for methamphetamine and weighed 42.5 and 70.3 grams respectively. *Id.* at 3–4. Detective Cardenas testified before the grand jury that he interviewed Urenda-Bustos and that Urenda-Bustos admitted he lived at the address where the drugs were found. *Id.* at 13. Detective Cardenas said he believed Gamboa-Cruz lived at Urenda-Bustos's address but did not similarly testify that Gamboa-Cruz admitted it. *Id.* The grand jury indicted Gamboa-Cruz and Urenda-Bustos for trafficking in a controlled substance by willfully, unlawfully, feloniously, knowingly, or intentionally possessing either actually or constructively, 28 grams or more of methamphetamine, or any mixture of a substance consisting of approximately 112.8 grams containing methamphetamine. ECF No. 29-4 at 5.

Gamboa-Cruz filed a pretrial petition for writ of habeas corpus alleging the evidence presented to the grand jury failed to establish probable cause that he possessed methamphetamine. ECF No. 20-1 at 10–11. He argued the grand jury received no evidence that he resided at the house or had control over it at the time the police discovered the methamphetamine. *Id.* He argued Detective Cardenas's testimony that he "thought" Gamboa-Cruz lived at the residence provided an insufficient nexus between Gamboa-Cruz and the residence to establish probable cause that he had actual or constructive possession of the drugs. *Id.* at 11–12. Gamboa-Cruz argued Cadena-Ambario never testified to the grand jury that he saw narcotics at the residence; the fact that Gamboa-Cruz lived at the residence (two months) before the drugs were found does not establish actual or constructive possession; and the presence of drugs two days after the crimes were committed against Cadena-Ambario was insufficient to establish possession. ECF No. 20-3 at 3–4. The trafficking charge against Gamboa-Cruz was summarily dismissed. ECF No. 90-1 at 2.

2.    *Additional Legal Principles*

The trafficking charge required proof Urenda-Bustos knowingly or intentionally sold, manufactured, delivered, or brought into Nevada, or had actual or constructive possession of, more than 28 grams of methamphetamine, or any mixture of substance consisting thereof. ECF No. 29-14 at 6; Nev. Rev. Stat. § 453.3385, *as enacted by Laws* 1999, c. 517, § 6. "A defendant has constructive possession of a controlled substance 'only if [he] maintains control or a right to control the contraband.'" *Marshall v. State*, 110 Nev. 1328, 1332–33 (1994) (internal quotation marks omitted). Possession "may be imputed when the contraband is found in a location which is immediately and exclusively accessible to the accused and subject to her [his] dominion and control." *Id.* (internal quotation marks omitted). "Two or more persons may have joint possession of a narcotic if jointly and knowingly they have its dominion and control." *Maskaly v. State*, 85 Nev. 111, 114 (1969).

"In grand jury proceedings the State need only show that a crime has been committed and that the accused probably committed it." *Sheriff, Clark Cnty., Nev. v. Fernandez*, 97 Nev. 61, 63 (1981). *See also* Nev. Rev. Stat. § 172.155(1) ("The grand jury ought to find an indictment when all the evidence before them, taken together, establishes probable cause to believe that an offense has been committed and that the defendant has committed it."). To commit an accused for trial, the state need only present enough evidence to support a reasonable inference the accused committed the offense. *See Fernandez*, 97 Nev. at 64. "Probable cause to support a criminal charge [m]ay be based on slight, even marginal evidence . . . because it does not involve a determination of the guilt or innocence of an accused." *Id.* at 63 (internal quotation marks omitted). Defendants may object to the sufficiency of evidence for an indictment by pretrial application for a writ of habeas corpus. *Id.* at 62–63; *see also* Nev. Rev. Stat. § 172.155(2). But, once convicted at trial, "[a]n error in a grand jury proceeding is harmless beyond reasonable doubt." *United States v. Mechanik*, 475 U.S. 66, 70 (1986).

3.    *Analysis of Ground 2(D)*

The Supreme Court of Nevada determined Urenda-Bustos failed to establish trial counsel was ineffective because Urenda-Bustos did not show a pretrial petition would have succeeded:

[A]ppellant argues that counsel should have filed a pretrial petition for a writ of habeas corpus challenging the trafficking charge. Appellant's only argument in this regard is that because one of the coconspirators successfully pursued such a writ, appellant would have been successful as well. This argument is insufficient as it does not establish that the petition would have been successful as to appellant. We therefore conclude that appellant fails to demonstrate that the district court erred by denying this claim.

ECF No. 31-27 at 4–5.

The state supreme court's determination constitutes an objectively reasonable application of *Strickland's* prejudice prong because Urenda-Bustos's subsequent jury conviction for the trafficking charge deems harmless any error in the grand jury's probable cause determination. *Mechanik*, 475 U.S. at 70. Even setting aside the jury conviction, a reasonable trial attorney could determine a pretrial motion to dismiss the charge would have been denied because the grand jury did not entertain identical evidence concerning possession of the methamphetamine by Urenda-Bustos and Gamboa-Cruz. Detective Cardenas informed the grand jury that Urenda-Bustos admitted he lived at the residence on the day the methamphetamine was found there. The grand jury received no evidence that Gamboa-Cruz admitted he lived at the residence at the time the methamphetamine was found there or that Gamboa-Cruz had control over the methamphetamine. Thus, the state supreme court's application of *Strickland* and determination that trial counsel was not ineffective in failing to pursue a pretrial writ petition seeking dismissal of the trafficking charge for lack of probable cause is objectively reasonable. Ground 2(D) is denied.

> E.    *Ground 2(E)—The Supreme Court of Nevada was reasonable in its application of Strickland and determination that trial counsel was not ineffective in failing to object that the state's questions and comment at trial were improperly leading.*

Urenda-Bustos alleges trial counsel was ineffective in failing to object to the state's questions to witnesses on the grounds they were leading, improperly testified that kidnapping and conspiracy occurred; elicited speculation and character evidence; constituted testimony by the prosecutor; and vouched for and bolstered Bonifacio's credibility. ECF No. 52 at 35–43. He alleges the respondents waived procedural defenses for any part of this claim by failing to assert defenses in a motion to dismiss the petition. ECF No. 89 at 38–41. The respondents object that Urenda-Bustos alleges additional facts and allegations in support of ground 2(E)[10] that must be dismissed

---

[10] The respondents compare ECF No. 52 at 38–40 with ECF No. 31-24 at 36–38.

as unexhausted or technically exhausted by procedural default. ECF No. 78 at 24–26. The respondents contend that, even if objection had been successful, there is no reasonable probability the result of the proceeding would have been different because the prosecution could rephrase the questions to elicit the same testimony, and there was overwhelming evidence of guilt. *Id.* As explained below, the state supreme court reasonably determined Urenda-Bustos failed to overcome the presumption that counsel's failure to object to the questions was a reasoned tactical decision or demonstrate prejudice as alleged in grounds 2(E)(1)–(3). For grounds 2(E)(4)–(7), the court finds the respondents did not waive defenses and the additional operative facts do not render the claim unexhausted or change the determination for ground 2(E) that counsel was not ineffective.

### 1.    Additional Background

The trial court instructed the jury that throughout the trial, "[w]hat counsel says is not evidence, whether it is during opening statements, whether it is through closing argument, whether it is during the questions and answers of the witnesses, bear in mind what counsel says is not evidence." ECF No. 29-16 at 31. The court explained, "when they are questioning witnesses, questions only have a meaning as it applies to the answer that is given. The only evidence that comes in, comes from the witnesses on the witness stand." *Id.* Before closing arguments, the court instructed that, "[t]he evidence which you are to consider in this case consists of the testimony of the witnesses, the exhibits, and any facts admitted or agreed to by counsel" and "[s]tatements, arguments and opinions of counsel are not evidence in the case," unless the attorneys stipulate to the existence of a fact. ECF Nos. 29-20 at 4; 29-22 at 13. The trial court instructed: "You must not speculate to be true any insinuations suggested by a question asked a witness. A question is not evidence and may be considered only as it supplies meaning to the answer." *Id.* The trial court admonished the jury that, "whatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it and remember it to be and by the law as given to you in these instructions . . . ." ECF No. 29-22 at 47.

### 2.    Applicable Legal Principles

"A leading question is a question that suggests the answer to the person being interrogated." *Ochave v. I.N.S.*, 254 F.3d 859, 871 n.4 (9th Cir. 2001) (Pregerson, J., dissenting) (internal

quotation marks and modifications omitted) (citing BLACKS LAW DICTIONARY 897 (7th ed.1999)). In Nevada, "[l]eading questions may not be used on the direct examination of a witness without the permission of the court." Nev. Rev. Stat. § 50.115(3)(a). Trial courts exercise control over the mode and order of interrogating witnesses and presenting evidence to (a) make the interrogation and presentation effective for the ascertainment of the truth; (b) avoid needless consumption of time; and (c) protect witnesses from undue harassment or embarrassment. *See* Nev. Rev. Stat. § 50.115(1). However, "[l]eading questions are permissible which direct the attention of the witness to the subject matter." *State v. Helm*, 66 Nev. 286, 311 (1949) (upholding questions asking witness whether inducements were held out to defendant, if any threats were made, any promise of reward, or any force used, which were all answered in the negative).

"There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington*, 562 U.S. at 109 (quoting *Yarborough*, 540 U.S. at 8). *See, e.g., Roe v. Belleque*, 232 F. App'x 653, 654–55 (9th Cir. 2007) (holding failure to object to prosecutor's leading questions of victim not prejudicial where victim's testimony before the leading questions and other evidence established the elements of the charge); *United States v. Bosch*, 914 F.2d 1239, 1246 (9th Cir. 1990) (holding counsel could reasonably decide to allow leading questions to avoid emphasizing damaging testimony where testimony would have been admissible if elicited through nonleading questions); *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 514–15 (9th Cir. 1989) (holding reversal inappropriate where questions did not substantially expand or alter earlier testimony elicited through proper, non-leading questions).

### 3.   *Supreme Court of Nevada's Determination*

The state supreme court determined Urenda-Bustos failed to establish the state's questions and comments were objectionable or that counsel's failure to object was not a tactical decision:

> [A]ppellant argues that counsel should have objected when the prosecutor asked leading questions, vouched for a witness, elicited character evidence, and engaged in speculation. Most of the comments appellant points to were not objectionable on these grounds. Even if they were, appellant fails to overcome the presumption that counsel's failure to object was a reasoned tactical decision. Appellant also fails to demonstrate prejudice. We therefore conclude that the district court did not err by denying this claim.

ECF No. 31-27 at 5.

4.    *Grounds 2(E)(1)–(3)—Operative facts identified in state court proceedings.*

a.    *Ground 2(E)(1)—The state supreme court reasonably concluded trial counsel was not ineffective in failing to object that the state improperly testified and led witnesses by using the word "kidnap."*

Urenda-Bustos alleges trial counsel was ineffective in failing to object to the prosecutor's use of the word "kidnap" and its assumption that a conspiracy existed, during examinations of Cadena-Ambario and the detectives, on the grounds that the questions were leading and presented improper testimony by the state. He claims counsel should have objected to the following question as leading Cadena-Ambario:[11]

> Q.    During this entire kidnapping, isn't it true that the Defendant was the one who was in charge?
>
> A.    Yes.

ECF No. 52 at 40 (citing ECF No. 29-18 at 17).[12]

Urenda-Bustos alleges counsel failed to object to the following questions directed to Detective Nelson on the grounds that the use of the word "kidnapping" was leading:

> Q.    Were you assigned to investigate a kidnapping of Eduardo Cadena that was documented under event number 100906-4146?
>
> A.    Yes, sir, I was.
> . . . .
> Q.    Were you making efforts to identify the homes or residences of the other people involved in the kidnapping?
>
> A.    Yes, sir.

---

[11] The parties did not adequately identify the state-court record supporting their positions whether certain operative facts for grounds 2(E) are exhausted, unexhausted, or technically exhausted by procedural default. Because the parties did not file the full state-court record, and because of the way the operative facts were exhibited during the initial state postconviction collateral-review proceedings, the court had to resolve the disputes by consulting the publicly available website for the state supreme court, which includes the full briefing and corresponding appendices of exhibits that Urenda-Bustos filed for his appeal from the denial of the initial state postconviction review petition. *See, e.g., infra,* p. 27 n.12. This court takes judicial notice of those state court documents. *Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011) (taking judicial notice of records filed during state habeas proceedings as federal courts have discretion to take judicial notice of documents "not subject to reasonable dispute.") (citing Fed. R. Evid. 201(b)).

[12] The questions alleged in Ground 2(E)(1) were presented for this claim in the initial state postconviction review petition (ECF No. 31-5 at 32–33), and on appeal from the denial of that petition (ECF No. 31-24 at 37 referring to 2 App. 274 (58:4–7); 3 App. 343 (100:11–21); 3 App. 344 (101:6–10, 101:24–25; 102:1–3); 3 App. 357 (156:14–18); 3 App. 359 (163:123–5, 164:1–2)).

1              The victim told us that he believed that Luis Urenda-Bustos and another man used to have an apartment at [another location].

2              We wanted to identify that because we knew the next day we would

3    go talk with the apartment management and get previous records who had rented that apartment in hopes of identifying the suspects.

4    . . . .

    Q.    Were you able to identify the residence of the third suspect involved in the

5    kidnapping?

6        A.    Yes, sir, the victim, Eduardo, told us that the other person that was involved in this crime—Can I refer to him by name?

7    . . . .

8        Q.    So the kidnapping happened on September 6th of 2010. The events you were just describing, driving around with the victim, is that on the 7th of

9    September.

10       A.    Yes, sir, it is.

11   *Id.* at 40–41 (citing ECF No. 29-19 at 26–28).

12   Urenda-Bustos claims trial counsel failed to object to the following questions directed to

13   Detective Cardenas on the grounds that the use of the word "kidnapping" was leading:

14       Q.    September 6th, 2010 a robbery/kidnapping occurred of Eduardo Cadena. Did you get involved with the investigation of that case?

15       A.    I did.

16   . . . .

17       Q.    And the day you met with Edward was September 7th?

18       A.    Yes.

19       Q.    The day after the robbery and kidnapping?

20       A.    Correct.

21   *Id.* (citing ECF No. 29-19 at 41–43).

22       The state supreme court's application of *Strickland* and determination that trial counsel

23   was not ineffective is reasonable because trial counsel could reasonably conclude the trial court

24   would overrule objections to the state's use of derivatives of the word "kidnap," as leading and

25   improper testimony. First, Cadena-Ambario testified that he previously used that word to describe

26   the incident in his written statement to police ("And [Urenda-Bustos] also ordered that I be

27   kidnapped."). ECF No. 29-18 at 8. Second, counsel could also conclude that word was used to

28   orient the witnesses to the subject matter of the questions and did not suggest answers to the

28

questions. *Helm*, 66 Nev. at 311. And counsel could reason the questions did not convey Urenda-Bustos was guilty of kidnapping and conspiracy to commit kidnapping given the instructions to the jury that counsel's questions were not evidence, and the jury must not speculate to be true any insinuations suggested by a question asked a witness. *See supra* p. 25. The state supreme court could reasonably conclude there is no reasonable probability the result of the proceeding would have been different had counsel objected to the questions. Detective Cardenas testified that Urenda-Bustos confessed to the facts supporting kidnapping, conspiracy to commit kidnapping, use of a deadly weapon, and extortionate collection of debt, and a transcript of the confession was admitted at trial. *See supra* pp. 5–6. Urenda-Bustos also conceded the state proved kidnapping, conspiracy to commit kidnapping, and extortion. ECF Nos. 29-1 at 20–21; 29-21 at 3. And, the jury was instructed that counsel's questions, including insinuations in those questions, were not evidence and could not be considered in determining the verdict. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (acknowledging the presumption that juries follow instructions). Ground 2(E)(1) is denied.[13]

> b.   *Ground 2(E)(2)—The state supreme court was reasonable in its determination that trial counsel was not ineffective in failing to object to questions posed to Cadena-Ambario on the grounds that the questions were leading and permitted the state to testify.*

Urenda-Bustos alleges trial counsel was ineffective in failing to object to the following questions, posed to Cadena-Ambario, as leading:[14]

Q.   Who did you live there with?

A.   With Martin.

---

[13] Urenda is misguided in his reliance on *United States v. Mason*, 993 F.2d 406, 408–09 (4th Cir. 1993). ECF No. 89 at 41–42. The ninth circuit court of appeals has followed the holding in *Mason*, i.e., that the use of guilt-assuming hypotheticals undermines the presumption of innocence and thus violates a defendant's right to due process. *United States v. Shwayder*, 312 F.3d 1109, 1121 (9th Cir. 2002). However, none of the questions Urenda identifies for ground 2(E)(1) posed a hypothetical asking a witness to assume Urenda-Bustos's guilt. Even if the questions impliedly assumed a kidnapping and conspiracy to commit kidnapping occurred, it was reasonable for the state supreme court to conclude there is no reasonable probability that, but for trial counsel's failure to object, the outcome of the trial would have been different. *See supra* pp 26–30.

[14] The questions alleged in support of Ground 2(E)(2) were presented during the initial state postconviction petition (ECF No. 31-5 at 29–31) and on appeal from the denial of that initial state petition (ECF No. 31-24 at 37 referring to 1 App. 243 (7:3–12); 1 App. 245 (13:17–22); 1 App. 247 (24:10–16); 1 App. 249 (30:7–9); 1 App. 250 (34:18–20); 2 App. 263 (15:12–20); 2 App. 264 (17:20–25, 18:1–2)).

Q.    And who else was living at the house with you and Martin?

A.    Mario Gamboa.

Q.    Did the person you knew as Martin have a girlfriend?

A.    Yes.

Q.    Did she also stay at the house?

A.    Yes.

. . . .

Q.    At this point had you already set up the jack and the tire iron?

A.    Yes.

Q.    Again, did he ask you for the title or demand the title?

A.    He was demanding it.

. . . .

Q.    You are referring to the Defendant and the other 2 all hit you together?

A.    Yes.

Q.    Did anyone hit you in the forehead to cause you to bleed?

A.    Mario Gamboa took out a gun from him.

. . . .

Q.    Could you see what was going on when you are inside the van?

A.    They put me in face down.

Q.    And did they put anything over your head or face?

A.    When they moved backwards to the corner, they covered my face.

. . . .

Q.    Now, what about your cell phone, did you have a cell phone?

A.    Yes, they took that also.

. . . .

Q.    Now, did you see the Defendant make any phone calls or hear him make any phone calls while the other 2 are gone?

A.    Yeah. He was communicating with them, but he was trying to do it far away from me, so I wouldn't hear what he was saying.

. . . .

A.    We went by the house. And there was a lot of police officers.

| | | |
|---|---|---|
| Q. | [D]id you consider jumping out of the car and running over to the police officers? | |
| A. | Yes. I thought of grabbing the steering wheel and pushing it so that maybe the car would crash, and maybe the police would look over and see what happened. | |

. . . .

| | | |
|---|---|---|
| Q. | In speaking with in [sic] female officer, did you give her anything from your wallet? |
| A. | No. |
| Q. | Did you have in your possession a card where you had written down Luis Urenda[-]Bustos'[s] name? |
| A. | Yes, but I think I gave it to the detective. |

. . . .

| | |
|---|---|
| Q. | You said they left in a hurry? |
| A. | They went out and they took bags, like clothing. |

ECF No. 52 at 35–37 (citing ECF No. 29-17 at 4, 6–8, 10–11).

The state supreme court's application of *Strickland* and determination that trial counsel's performance was not deficient because counsel could make a reasoned tactical decision not to object to the above questions. Counsel could reasonably conclude the questions were either not leading (did not suggest the answers) or, if leading, an objection would be overruled as the questions were clarifying or foundational, directed Cadena-Ambario to the subject of the question based upon other witness testimony and evidence or Cadena-Ambario's prior statement to police, his grand jury testimony, or his prior testimony. Counsel could conclude objection was futile because the state could rephrase the questions. It is also reasonable to conclude that, but for counsel's failure to object, there is no reasonable probability the result of the trial would have been different as Urenda-Bustos's confession was presented to the jury, *see supra* pp. 5–6, and he conceded that the state proved kidnapping, conspiracy to commit kidnapping, and extortionate collection of debt. ECF Nos. 29-1 at 20–21; 29-21 at 3. Ground 2(E)(2) is denied.

> c.    *Ground 2(E)(3)—The state supreme court reasonably determined trial counsel was not ineffective in failing to object that leading questions elicited inadmissible character testimony.*

Urenda-Bustos alleges counsel was ineffective in failing to object to questions posed to Cadena-Ambario on the grounds they are leading and elicited character evidence:

Q.    And when you left, did you leave on good terms with the Defendant?

A.    Not very well.

Q.    Why was that?

A.    Because there were differences. He and the other guys, they seemed like people that could do other things, like they could cause me damage.

ECF No. 52 at 38 (ECF No. 29-17 at 4–5).[15]

The state supreme court's application of *Strickland* and determination that trial counsel was not ineffective is reasonable. Trial counsel could reason that objection to the questions as leading was futile because the questions were not leading (did not suggest answers). Moreover, it is reasonable to conclude there is no reasonable probability the result of the proceedings would have been different had counsel objected to the form of the questions as the testimony could have been elicited through rephrasing the questions, and the jury received photographs of Cadena-Ambario's injuries, e.g., showing the "damage" caused by Urenda-Bustos, Gamboa-Cruz, and Lopez-Lauro, and heard testimony from those who had observed Cadena-Ambario's injuries. ECF Nos. 29-18 at 5, 7–8, 35; 29-1 at 5. Ground 2(E)(3) is denied.

> A.    *Grounds 2(E)(4)–(7)—Urenda-Bustos's newly alleged operative facts in support of ground 2(E) do not render ground 2(E) unexhausted and do not change the outcome of the claim.*

The parties dispute whether Urenda-Bustos fairly presented certain operative facts and allegations in support of ground 2(E) to the state courts, and whether the respondents waived their defenses. ECF Nos. 78 at 24–25; 89 at 38–41. As discussed below, the respondents did not waive the defenses because they were raised in the answer; the additional operate facts do not render ground 2(E) unexhausted; and the inclusion of the additional factual allegations offers no basis to change the state supreme court's determinations or for federal habeas corpus relief for ground 2(E).

> a.    *The respondents did not waive exhaustion and default defenses.*

A state prisoner first must exhaust state court remedies on a habeas corpus claim before presenting that claim to the federal courts. 28 U.S.C. § 2254(b)(1)(A). This exhaustion requirement

---

[15] Urenda-Bustos presented these questions as facts in support of this claim to the state supreme court by citing to the Appendix. *See supra* p. 27 n.11. The state-court record shows that the claim based on these facts was exhausted through a complete round of initial collateral proceedings to the highest state court level of review. ECF Nos. 31-5 at 31–32; 31-24 at 37. *See also O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999).

ensures that the state courts, as a matter of comity, will have the first opportunity to address and correct alleged violations of federal constitutional guarantees. *See Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991). "A petitioner has exhausted his federal claims when he has fully and fairly presented them to the state courts." *Woods v. Sinclair*, 764 F.3d 1109, 1129 (9th Cir. 2014). To satisfy the exhaustion requirement, a claim must be raised through one complete round of either direct appeal or collateral proceedings to the highest state court level of review available. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999); *Peterson v. Lampert*, 319 F.3d 1153, 1156 (9th Cir. 2003). A state appellate court decision on the merits of a claim exhausts the claim. *See e.g., Comstock v. Humphries*, 786 F.3d 701, 707 (9th Cir. 2015).

Fair presentation requires a petitioner to present the state courts with both the operative facts and the federal legal theory upon which the claim is based. *See Castillo v. McFadden*, 399 F.3d 993, 999 (9th Cir. 2005). A properly exhausted claim "'must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief.'" *Woods*, 764 F.3d at 1129 (quoting *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996)).

A petitioner may reformulate his claims so long as the substance of his argument remains the same. *See Picard v. Connor*, 404 U.S. 270, 277–78 (1971) (observing "[t]here are instances in which 'the ultimate question for disposition,' will be the same despite variations in the legal theory or factual allegations urged in its support.") (internal citation omitted). "A claim has not been fairly presented in state court if new factual allegations either fundamentally alter the legal claim already considered by the state courts, or place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it." *Dickens v. Ryan*, 740 F.3d 1302, 1318 (9th Cir. 2014) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986)).

"[T]he defense of procedural default should be raised in the first responsive pleading in order to avoid waiver." *Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005). In *Morrison,* the ninth circuit court of appeals considered whether a procedural-default defense was waived because it was not raised in a motion to dismiss and was instead asserted in the answer. *See id.* at 1045–47. The circuit concluded there was no waiver because such defenses must be raised in a responsive pleading, e.g., an answer, and that a "motion to dismiss is not a responsive pleading

within the meaning of the Federal Rules of Civil Procedure." *See id.* (citing *United States v. Valdez*, 195 F.3d 544, 548 (9th Cir. 1999) (holding that failure to raise a procedural default defense in a motion to dismiss in the federal district court proceedings did not result in waiver of the defense on remand because "the government only filed a motion to dismiss, which was granted, and never filed an answer" to the habeas petition). *See also, e.g., Randle v. Crawford*, 604 F.3d 1047, 1052–53 (9th Cir. 2010) (following *Morrison* and rejecting claims that a statute-of-limitations defense was waived because it was not raised in the first motion to dismiss the habeas petition or in response to a later motion to reopen the case following a return to state court for exhaustion, because neither of those filings or potential filings constituted responsive pleadings under Fed. R. Civ. P. 7(a)). *Cf. Vang v. Nevada*, 329 F.3d 1069, 1072–74 (9th Cir. 2003) (holding procedural default defense waived by failing to raise it in either a responsive pleading or motion to dismiss).

The respondents contend in their answer to the petition that the factual allegations, i.e.., the questions posed by the prosecutor, designated in grounds 2(E)(4)–(7) were not alleged for this claim in the state-court proceeding, rendering the claim unexhausted or technically exhausted by procedural default, and that Urenda-Bustos cannot overcome the default. ECF No. 78 at 24–25.[16] The court concludes the defenses of exhaustion and procedural default are not waived for grounds 2(E)(4)–(7) because the respondents raised them in their answer.[17] *See Morrison*, 399 F.3d at 1046.

> **b.**    *Ground 2(E)(4)—Trial counsel was not ineffective in failing to object to state's question on the grounds that it invited speculation.*

Urenda-Bustos claims counsel was ineffective in failing to object to the following question as leading and that he was prejudiced because it elicited speculation from Cadena-Ambario:

---

[16] *See* ECF No. 78 at 24 (noting the allegations on pages 38–40 of the petition were not raised in the appeal from the denial of the initial state postconviction review petition).

[17] The court notes it is customary, and the court's preference, that the respondents raise procedural defenses in a motion to dismiss. Here, although there was more than one opportunity, the respondents did not do so. Urenda raised ground 2(E) in its the present form as ground 2(F) in his third-amended petition. ECF No. 19 at 40–48. The respondents moved to dismiss that petition but asserted no affirmative defenses to ground 2(F). ECF No. 28. Following adjudication of the motion, this proceeding was stayed pending Urenda's return to state court to exhaust ground 1. ECF No. 46. Upon reopening of the case, Urenda filed the operative fourth-amended petition (ECF No. 52), asserts the claim formerly known as ground 2(F), as ground 2(E) (ECF No. 52 at 35–43). The respondents moved to dismiss the fourth amended petition without raising an affirmative defense for ground 2(E). ECF No. 60.

Q.     And what was his reaction to that, did he say anything to you when you said that?

A.     He seemed very nervous, because 2 of his friends had left. The ones that were with him had gone, because the police was [sic] at the other house. He was afraid that maybe they would come and get him at the house because the police already knew everything.

ECF Nos. 29-18 at 4; 52 at 38.

The above question was included in support of this claim in the initial state postconviction-review petition. ECF No. 31-5 at 32. But, on appeal from the denial of that petition, the opening brief merely asserted counsel "failed to object to speculative answers provided by witnesses." ECF No. 31-24 at 37–38. Urenda-Bustos did not identify the question by directing the state supreme court to the record or set forth the question verbatim. *Id.* Urenda-Bustos also did not identify this factual allegation during his second round of state-postconviction proceedings. ECF Nos. 40-1; 40-4. This additional factual allegation does not, however, fundamentally alter the claim considered by the state courts (that counsel was ineffective in failing to object to the prosecutor's questions to trial witnesses on the grounds that they were leading), place the case in a significantly different and stronger evidentiary posture than when the state courts considered it, or change the outcome of the claim. A reasonable trial attorney could conclude the question was neither leading nor invited speculation because it asked for observations of Urenda-Bustos's reaction, and what Cadena-Ambario heard Urenda-Bustos say. ECF No. 29-18 at 4. There is no reasonable probability the result of the proceeding would have been different had counsel objected to the question and answer. Bonifacio testified Urenda-Bustos "looked like he was panicking" and requested she drive away with rifles and her backpack containing methamphetamine and cash. ECF No. 29-18 at 33. And, the jury received evidence of Urenda-Bustos's confession to kidnapping and extortion, which was conceded in closing argument. *See supra* p. 31. Ground 2(E)(4) is denied.

c.     *Ground 2(E)(5)—Trial counsel was not ineffective in failing to object to the state's comment and question to the state's expert.*

Urenda-Bustos alleges counsel was ineffective in failing to object that the following comment to Forensic Scientist Gouldthorpe constituted improper testimony by the prosecution and the following question to the expert was leading:

35

A.    So, these were the plastic bags that I received. These plastic bags, I don't know where they came from.

Q.    They came from the evidence clerk.

. . . .

Q.    Are you aware that Nevada law does not require purity tests when testing methamphetamine?

A.    Yes.

ECF No. 52 at 38–39 (citing ECF No. 29-18 at 27–28).

The above remark and question were not alleged as operative facts in support of this claim in the initial state-postconviction petition (ECF No. 31-5 at 29–34), on appeal from the denial of that petition (ECF No. 31-24 at 36–38), or in the second round of state-postconviction proceedings (ECF Nos. 40-1; 40-4). The above comment and question do not fundamentally alter the legal claim already considered by the state courts (that counsel was ineffective in failing to object to the prosecutor's questions on the grounds that they were leading or constituted improper testimony by the prosecutor), place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it, or change the outcome of the claim.

A reasonable trial attorney could anticipate that an objection to the remark that certain bags came from the evidence clerk as improper testimony by the prosecutor was would merely result in striking the comment and another admonition to the jury that, "what counsel says is not evidence . . . whether it is during the questions and answers of the witnesses, bear in mind what counsel says is not evidence." ECF No. 29-16 at 31. Counsel could reasonably conclude the prosecutor's comment was not testifying and was of no consequence to the trial because the expert clarified he did not recognize certain bags; identified the bags he recognized and tested; and testified the bags he tested contained more than the statutorily required amount of methamphetamine for purposes of the trafficking offense. ECF No. 29-18 at 26–27. Consequently there is also no reasonable probability that, but for counsels' failure to object, the result of the trial would have been different.

A reasonable trial attorney could determine objection to the prosecutor's question whether Nevada law required a purity examination of the contents of the plastic bags was futile and likely to be overruled. The question oriented the expert's attention to his earlier testimony on cross-examination that the forensic lab was capable of testing the purity of the substance. ECF No. 29-

18 at 28. Counsel could reasonably conclude the question directed the expert to the subject matter of the question so that the state could clarify why the expert did not test the purity of the substance despite the ability to do so. Moreover, if trial counsel objected, the prosecutor could have elicited the desired testimony by rephrasing the question. There is also no reasonable probability the result of the proceedings would have been different, but for counsel's failure to object to the question about the purity of the substance containing methamphetamine, because the jury was instructed the aggregate weight required for trafficking in a controlled substance refers to the aggregate weight of the entire mixture rather than the weight of only that portion of the controlled substance contained in the mixture. ECF No. 29-22 at 37. Ground 2(E)(5) is denied.

> d. *Ground 2(E)(6)—Trial counsel was not ineffective in failing to object that questions to Bonifacio were leading and bolstering.*

Urenda-Bustos contends counsel was ineffective in failing to object that the following questions posed to Bonifacio were leading and prejudicially bolstered her credibility:

Q.   Let's talk about September 6, 2010. Did you see Eduardo [Cadena-Ambario] bleeding at the house.

A.   Yes, I did.

. . . .

Q.   And you suffered a conviction for accessory to kidnapping, a felony, in 2011; wasn't it 2011, is that right?

A.   Yes.

Q.   Because of this case now, did you know that your boyfriend was involved in crystal methamphetamine?

A.   Yes.

Q.   And had you seen him—have you previously seen him with crystal methamphetamine before this occasion?

A.   No.

Q.   Now, you were asked—do you remember doing an interview with the detective in this case?

A.   Yes.

Q.   And they asked you about the relationship between [Urenda-Bustos], [Gamboa-Cruz], and [Lopez-Lauro]?

A.      Yes.

. . . .

Q.      And let me ask you, who of the 3 is in charge?

A.      I told them I don't know.

Q.      Didn't you say it would probably be [Urenda-Bustos]?

A.      Yes.

ECF No. 52 at 39 (citing ECF No. 29-18 at 32, 36–37).

As for ground 2(E)(5), the above operative facts were not presented to the state courts in support this claim during the initial or second round of state-postconviction proceedings. ECF Nos. 31-5 at 29–34; 31-24 at 36–38; 40-1; 40-4. The additional facts likewise fail to fundamentally alter the legal claim already considered by the state courts (that trial counsel was ineffective in failing to object to leading questions that vouched for Bonifacio), place the claim in a significantly different and stronger evidentiary posture than when the state courts considered it, or change the outcome of the claim.

It was reasonable for counsel to refrain from objecting to the question whether Bonifacio saw Cadena-Ambario's head bleeding on the day of the kidnapping because Cadena-Ambario had already testified his head was bleeding while he was at the house and he saw that Bonifacio saw him while she was standing in the living room. ECF Nos. 29-17 at 11; 29-18 at 5, 13. Counsel could choose not to object to the remaining questions because some of the questions did not suggest an answer; some directed Bonifacio's attention to the subject matter of the questions and to her prior statement to police; and the testimony could be elicited by rephrasing the questions.

There is no reasonable probability that but for counsel's failure to object, the result of the trial would be different. Bonifacio later explained that she saw Cadena-Ambario with a bloody forehead on the night that Urenda-Bustos directed her to leave the house with the rifles, drugs, and cash. ECF No. 29-18 at 35. Cadena-Ambario previously testified Urenda-Bustos was in charge of the kidnapping as he directed the actions of Gamboa-Cruz and Lopez-Lauro who listened to him. ECF Nos. 29-17 at 9; 29-18 at 17. Detective Cardenas testified that Urenda-Bustos confessed to the kidnapping and that he was responsible because Cadena-Ambario owed him money and confessed that he directed Gamboa-Cruz to dispose of the firearm and directed Gamboa-Cruz and

Lopez-Lauro to take Cadena-Ambario's wallet, keys, telephone, and vehicle or vehicle title. ECF No. 29-18 at 35. Counsel would be reasonable in concluding that objection to the question whether Bonifacio realized her boyfriend was involved in crystal methamphetamine because of this case was futile as Bonifacio had already identified the methamphetamine Urenda-Bustos put inside her backpack (ECF No. 29-18 at 36), and the state could elicit the desired testimony by rephrasing the questions. Ground 2(E)(6) is denied.

> e.   *Ground 2(E)(7)—Trial counsel was not ineffective in failing to object to questions posed to Detective Cardenas on the grounds that they were leading and improperly bolstered Bonifacio's Testimony.*

Urenda-Bustos claims trial counsel was ineffective because he failed to object to leading questions directed to Detective Cardenas and because they bolstered Bonifacio's testimony:

> Q.   [Y]ou were asked about the backpack with drugs in it, and you said in your investigation you learned that was found at the house with the search warrant, right?
>
> A.   That's correct.
>
> Q.   And you asked whether that had come up in Melriz'[s] statement?
>
> A.   Yes.
>
> Q.   Where you learned that she had said she was hiding those [for Urenda-Bustos].
>
> A.   Luis [Urenda-Bustos], correct.

ECF No. 52 at 39–40 (citing ECF No. 29-19 at 52).

As with grounds 2(E)(5) and (6), these facts were not raised in support of this claim during the initial or second state-postconviction proceedings. ECF Nos. 31-5 at 29–34; 31-24 at 36–38; 40-1 and 40-4. Likewise, the additional factual allegations do not fundamentally alter the legal claim already considered by the state courts (that the state asked leading questions that vouched for Bonifacio), place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it, or change the outcome of the claim.

A reasonable trial attorney could choose not to object to the questions as leading or bolstering because they directed Detective Cardenas to his prior testimony on cross-examination that Urenda-Bustos did not tell Cardenas anything about the backpack containing the drugs; the

detective learned about the backpack because it was seized during the execution of the search warrant; and Bonifacio mentioned the backpack in her statement. ECF No. 29-19 at 50–51. There is no reasonable probability the result of the proceedings would have been different had counsel objected because the examination recapitulated previous testimony. Ground 2(E)(7) is denied.[18]

> F.    *Ground 2(F)—The Supreme Court of Nevada was reasonable in its application of Strickland and determination that trial counsel was not ineffective in failing to object to Cadena-Ambario's identification of Urenda-Bustos based on a single photographic identification procedure.*

Urenda-Bustos alleges trial counsel was ineffective in failing to move to suppress Cadena-Ambario's pretrial identification of Urenda-Bustos. ECF No. 52 at 43–45. He alleges Cadena-Ambario identified Gamboa-Cruz and Lopez-Lauro in six-pack photographic lineup arrays, but the police improperly showed him an isolated photograph of Urenda-Bustos. *Id.* The respondents contend the identification was not suggestive and there is no prejudice as Cadena-Ambario and Urenda-Bustos were not strangers. ECF No. 78 at 26–27.

The Supreme Court has held "[a]n identification infected by improper police influence . . . is not automatically excluded." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). The Supreme Court explained in *Perry* that "the reliability of relevant testimony typically falls within the province of the jury to determine," but the Supreme Court previously recognized an additional "due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Id.* "If there is 'a very substantial likelihood of irreparable misidentification,'" a "judge must disallow presentation of the evidence at trial." *Id.* (internal

---

[18] Alternatively, even assuming arguendo that the new factual allegations in grounds 2(E)(4)–(7) render the claim unexhausted, it is technically exhausted by procedural default. *Dickens v. Ryan*, 740 F.3d 1302, 1317 (9th Cir. 2014) ("An unexhausted claim will be procedurally defaulted, if state procedural rules would now bar the petitioner from bringing the claim in state court."). For claims of ineffective assistance of trial counsel, petitioners may overcome cause for procedural default where (1) the claim is "substantial"; (2) the "cause" consists of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding"; (3) the state collateral review proceeding was the "initial" review proceeding for the claim; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding." *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14, 18 and citing *Coleman*, 501 U.S. 722). An ineffective-assistance-of-trial-counsel claim "is insubstantial" if it lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14–16 (citing *Miller-El*, 537 U.S. 322). Urenda-Bustos did not assert that he can overcome the default under *Martinez*. Even assuming Urenda had asserted he could overcome the default under *Martinez*, the new factual allegations in grounds 2(E)(4)–(7) do not raise a substantial claim sufficient to overcome the default. *See infra* pp. 32–40.

citation to *Simmons v. United States*, 390 U.S. 377, 384 (1968)). However, "if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Id.* When no improper law enforcement activity is involved, reliability is tested by cross-examination, rules of evidence, and jury instructions. *See id.* at 232.

Here, Detective Nelson snapped a photograph of Urenda-Bustos when Urenda-Bustos was arrested. ECF No. 29-19 at 30–32. Nelson showed the photograph to Cadena-Ambario "due to him being the former roommate of the victim, and the victim knowing him so well, not only by name, but by face," "to have him identify that we had the right guy." *Id.* Cadena-Ambario also immediately identified Gamboa-Cruz and Lopez-Lauro when Cadena-Ambario viewed their photographs contained in six-pack photographic lineup arrays. *Id.*

The Supreme Court of Nevada determined that the single-photograph procedure was not unnecessarily suggestive because Cadena-Ambario was familiar with Urenda-Bustos:

> [A]ppellant contends that counsel should have objected to testimony that the victim identified him in a "show-up" on the ground that the identification was unnecessarily suggestive. The identification was not unnecessarily suggestive under the circumstances, given that the record indicates the victim had known appellant for several years and they lived together for several months. *See Johnson v. State*, 131 Nev., Adv. Op. 58, 354 P.3d 667, 672–73 (Ct. App. 2015) ("[T]he Due Process Clause of the United States and Nevada Constitutions forbids a criminal prosecution to be based upon any witness's identification that was procured under circumstances that were unnecessarily suggestive and likely to have resulted in a mistake that cannot be repaired." (footnote omitted)). Appellant therefore fails to demonstrate deficient performance or prejudice. Accordingly, we conclude that the district court did not err by denying this claim.

ECF No. 31-27 at 5.

The state court record supports the state supreme court's determination that trial counsel was not ineffective in failing to object to evidence of Cadena-Ambario's pretrial identification of Urenda-Bustos as unnecessarily suggestive. Cadena-Ambario knew Urenda-Bustos for about three years, and they lived together for a couple of months only a couple of months before the incident. ECF Nos. 29-17 at 4–5; 29-18 at 11. Moreover, Cadena-Ambario spent a substantial amount of time with his captors without anything covering his head at Urenda-Bustos's residence and in Urenda-Bustos's vehicle. It is reasonable to conclude the identification was not the result of

suggestive circumstances such that there is a very substantial likelihood of irreparable misidentification. *See Perry*, 565 U.S. at 232. Assuming arguendo the single-photograph-identification procedure is suggestive, and counsel should have objected, the record shows there is no reasonable probability the identification would have been excluded. The state court record demonstrates the identification was reliable given that Cadena-Ambario and Urenda-Bustos knew each other for three years, had lived together for a couple of months, and Urenda-Bustos admitted to his participation in the crimes against Cadena-Ambario. Because a motion to suppress the pretrial identification lacked merit, the state supreme court reasonably determined trial counsel's failure to object or seek to exclude the pretrial identification based on an isolated photograph of Urenda-Bustos was neither deficient nor prejudicial under *Strickland*. Ground 2(F) is denied.

> G.    *Ground 2(G)—The Supreme Court of Nevada was reasonable in its application of Strickland and determination that trial counsel was not ineffective in failing to prepare for cross-examination and impeach Cardenas and Bonifacio.*

Urenda-Bustos alleges trial counsel was ineffective in failing to impeach Detective Cardenas and Bonifacio due to counsel's inadequate preparation and knowledge of prior statements given to the police and testimony given at trial. ECF No. 52 at 45–46. The respondents contend the state supreme court reasonably concluded Urenda-Bustos failed to demonstrate deficient performance or prejudice under *Strickland*. ECF No. 78 at 27–28.[19]

---

[19] Urenda also claims that, had trial counsel effectively cross-examined the detective, counsel would have elicited "significant information concerning" the events, and called into question the reliability of the translation of Urenda's statements to the detective. ECF No. 52 at 48. The respondents correctly point out that Urenda does not specify in the petition what "significant information", or alleged translation discrepancies counsel would have revealed but for counsel's inadequate performance or how there is a reasonable probability the result of the trial would have been different had counsel done so.

Rule 2(c) of the Habeas Rules requires a federal habeas petitioner to specify all grounds for relief and "state the facts supporting each ground." Notice pleading is not sufficient to satisfy the specific pleading requirements for federal habeas petitions. *See Mayle v. Felix*, 545 U.S. 644, 655–56 (2005) (noting that Fed. R. Civ. P. 8(a) requires only "fair notice" while Habeas Rule 2(c) "is more demanding," explaining that mere legal conclusions without facts are not sufficient—"it is the relationship of the facts to the claim asserted that is important . . . ."). Mere conclusions of violations of federal rights without specifics do not state a basis for habeas corpus relief. *See id.* at 649. *See also Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995). A claim for relief is facially plausible when the pleading alleges facts that allow the court to draw a reasonable inference that the petitioner is entitled to relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because Urenda-Bustos's allegations that "significant information" and questions about the reliability of the translation of Urenda-Bustos's interview with the police do not allow the court to draw any reasonable inferences that he is entitled to federal habeas relief, the allegations are dismissed as conclusory. *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

The Supreme Court of Nevada determined Urenda-Bustos did not overcome the presumption that counsel's cross-examination was part of a reasoned strategy or demonstrate prejudice:

> [A]ppellant argues that counsel was not prepared to cross-examine witnesses. Appellant fails to overcome the presumption that counsel's cross-examination was part of a reasoned strategy. *See State v. Kinder*, 942 S.W.2d 313, 335 (Mo. 1996) ("Subjects covered and the extent of cross-examination are matters of trial strategy and must be left to the judgment of counsel."). Appellant also fails to demonstrate prejudice. We therefore conclude that the district court did not err by denying this claim.

ECF No. 31-27 at 6. For the reasons discussed below, the state supreme court's applications of *Strickland* and determinations are objectively reasonable.

> 1. *Ground 2(G)(1)—The Supreme Court of Nevada reasonably determined that trial counsel was not ineffective in failing to prepare for cross-examination and failing to impeach Detective Cardenas.*

Urenda-Bustos alleges trial counsel inadequately cross-examined Detective Cardenas's assertions that Urenda-Bustos confessed that he struck Cadena-Ambario in the head with a firearm and demanded Cadena-Ambario's vehicle title. ECF No. 52 at 46–48. He claims that trial counsel failed to locate Cadena-Ambario's interview statements in which Cadena-Ambario claimed it was Gamboa-Cruz, not Urenda-Bustos, who struck him on the head with a firearm:

> Q.   And what do you recall the [sic] inconsistencies between [Cadena-Ambario]'s statement and [Urenda-Bustos]'s statement?
>
> A.   I believe [Cadena-Ambario] said, they had a gun, and [Urenda-Bustos] initially denied it. I would have to refer back to the statement. Can you point out what you are referring to?
>
> Q.   Well, I want to know the general things, just like you just mentioned the gun, anything that sticks out to you in regards to huge inconsistencies between the two stories?
>
> . . . .
>
> Q.   Now, before the break we were discussing that there was a difference at first in what [Urenda-Bustos] was telling about how [Cadena-Ambario] was struck, is that correct?
>
> A.   I don't remember—We taped [Cadena-Ambario]'s statement. If you have it, I can refer to it and tell you exactly what he said, and then I can tell you what [Urenda-Bustos] said. But [Urenda-Bustos] in his statement tells me that he struck him with a metal pipe initially.

43

1    Q.    All right. If you need the statement to help refresh your recollection, and you made statements off of that, so—

2    A.    Okay.

3    Q.    For right now I just want you to focus in regards to the gun. Who hit [Cadena-Ambario]? Is there an inconsistency as to what you learned from [Cadena-Ambario], and from what you learned from [Urenda-Bustos]?

4

5    A.    You know what page it's on, or you want me to read through the whole thing?

6

7    Q.    I don't know what page it is. Let's handle it this way: Didn't [Cadena-Ambario] say that it was [Gamboa-Cruz] that hit him?

8    A.    [Urenda-Bustos] said that.

9    Q.    Wait, no. What [Cadena-Ambario] said in regards to who hit him, did he say it was [Urenda-Bustos], or [did] he say [Gamboa-Cruz]?

10

11   A.    Who hit you in the face? [Gamboa-Cruz].

12   Q.    You can['t] read out of the statement. You can look at it to refresh your recollection, and then tell us what your recollection was.

13   A.    Okay. I asked [Cadena-Ambario] who hit him in the face, and he said, [Gamboa-Cruz].

14

15   Q.    And so [Urenda-Bustos] told you though that he hit him in the face with a gun?

16   A.    Yes.

17   Q.    That was a BB gun?

18   A.    Yes. And then Gamboa hit [Cadena-Ambario].

19   Q.    With that same gun, or a different gun?

20   A.    The same gun is what [Urenda-Bustos] said.

21   Q.    What [Urenda-Bustos] said. But [Cadena-Ambario] never said that he was hit once by [Urenda-Bustos] with a gun, and once by [Gamboa-Cruz] with the gun, is that correct?

22

23   A.    I believe so.

24   Q.    Go ahead and look through the statement if you believe that was said in there.

25

26   A.    [Cadena-Ambario] said that [Gamboa-Cruz] was the one that hit him with the gun.

27   Q.    Right. So based upon your recollection, I want this to be clear for the record, he never said that [Urenda-Bustos] hit him with the gun?

28

44

A.   Let me read through it, and I'll tell you exactly what he said. It doesn't look like he says [Urenda-Bustos] hit him with a gun.

Q.   Okay. Now, again I want you to be thinking—Let me ask you this first: If [Urenda-Bustos] in his statement, when you look at page 9, did he tell you that all he wanted to do was borrow the car title?

A.   He says, you know what, give me the car title. It sounds like he demanded it. And then he says, let me borrow your car title.

Q.   And the reasoning that he states further on in that he wants the car title is, he's got to hold onto that car title until [Cadena-Ambario] gives him the money, is that correct?

A.   And according to [Urenda-Bustos], yes.

Q.   Now, does [Cadena-Ambario] say anything different to what [Urenda-Bustos] told you about that?

A.   I don't remember him mentioning it at the time. You have a certain page you are referring to?

Q.   Well, no, I'm just asking you. I know what it says in [Cadena-Ambario]'s statement, so I'm asking you, do you have any recollection of him saying that? I know what he testified to. Additionally, here in court I'm asking you.

A.   You know, I didn't get a chance to review [Cadena-Ambario]'s statement since we conducted the statement. I couldn't tell you. Do I remember? No. I can read through it again and tell you.

Q.   That's fine. We'll just go with what he testified to. Okay. That's easier.

*Id.* (citing ECF No. 29-19 at 48–49).

According to the above trial record, despite Urenda-Bustos's claims that trial counsel was unprepared and unfamiliar with prior testimony and statements, trial counsel referred to one of the statements by page number, knew what Cadena-Ambario told police during his interview and in his testimony at trial, and successfully elicited Detective Cardenas's agreement that Cadena-Ambario told police that Gamboa-Cruz, not Urenda-Bustos, hit him in the head with a firearm. And the record indicates that counsel was successful in his objective to show Cadena-Ambario did not contradict Urenda-Bustos's statement to the police that Urenda-Bustos asked for the vehicle title as collateral until Cadena-Ambario paid his debt to Urenda-Bustos. Moreover, there is no prejudice as Urenda-Bustos conceded he hit the victim and committed extortion. *See supra* p. 5.

Urenda-Bustos additionally alleges (ECF No. 52 at 49) that trial counsel was ineffective in failing to impeach Detective Cardenas's alleged assertion at trial that it was Urenda-Bustos who

tied Cadena-Ambario with the zip tie, by failing to direct the detective to Cadena-Ambario's statement in which he told police that it was Gamboa-Cruz, not Urenda-Bustos, who did so:

Q.     And [Urenda-Bustos] also said that he took off the zip ties from [Cadena-Ambario] and tied him up with shoelaces because he was still trying to leave, is that correct?

A.     He said he tied him up with the zip tie because he wanted to talk to him, and then he cut the zip tie off, and then he tied his hands again with a shoelace.

Q.     Let's back up. You made a statement I don't think [Urenda-Bustos] said.

A.     Okay.

Q.     Now—

A.     What page are you referring to?

Q.     I'll get to it. Is it your recollection that [Urenda-Bustos] tied him up with the zip ties, or did [Gamboa-Cruz] tie him up with the zip ties? Because you just said, he tied him up with the zip ties. When you said, he, you are referring to [Urenda-Bustos]?

A.     I remember [Urenda-Bustos] saying, I want to talk to you. That's when he tied his hands up. If you can tell me what page it's on, I can tell you exactly what [Urenda-Bustos] said at that point, but they were definitely both present when the hand tying was going on.

Q.     Well, he was present, but that doesn't mean he tied him up, is that correct?

A.     Well, when he tied him up with the shoe laces, [Urenda-Bustos] was the only one there.

Q.     So we are on the same page with regard to the shoe lace, that [Urenda-Bustos] did tie him up with the shoe laces, right?

A.     Yes.

Q.     Based on your recollection?

A.     Yes.

Q.     And [Urenda-Bustos] was the one to cut the zip ties, based on your recollection, in the statement, is that right?

A.     Correct, according to [Urenda-Bustos].

Q.     Wasn't that according to [Cadena-Ambario] also?

A.     Yes, I believe he said that Luis cut off the zip tie.

ECF No. 52 at 49 (citing ECF No. 29-19 at 50).

It was reasonable for the state supreme court to conclude Urenda-Bustos failed to demonstrate counsel's cross-examination was deficient and prejudicial because the record shows that Cadena-Ambario previously testified it was Gamboa-Cruz, not Urenda-Bustos, who tied him with the zip ties in the presence of Urenda-Bustos and Lopez-Lauro, and that Urenda-Bustos later removed the zip tie and tied Cadena-Ambario's wrists with a shoelace. ECF Nos. 29-17 at 8–11; 29-18 at 4, 6, 16. Moreover, the detective had already testified that Urenda-Bustos told him that Gamboa-Cruz tied Cadena-Ambario with the zip tie. ECF No. 29-19 at 47. There is no reasonable probability the result of the proceeding would have been different had counsel sought to impeach the detective with Cadena-Ambario's testimony. Ground 2(G)(1) is denied.

> 2. *Ground 2(G)(2)—The Supreme Court of Nevada reasonably determined that trial counsel was not ineffective in failing to prepare for cross-examination and failing to impeach Bonifacio.*

Urenda-Bustos alleges trial counsel was ineffective in failing to impeach Bonifacio's testimony that Urenda-Bustos placed the methamphetamine and cash in her backpack on the night of the kidnapping, with her prior statement to police that she hid the drugs, and that the drugs were in her backpack "for a long time," "like a mont, [sic] like a week." ECF No. 52 at 49–51 (citing ECF No. 31-5 at 91–94).

The state supreme court's determination that Urenda-Bustos failed to overcome the presumption that counsel's cross-examination was part of a reasoned strategy is objectively reasonable. ECF No. 31-27 at 6. The trial record shows trial counsel elicited on cross-examination Bonifacio's testimony that she told the police she did not know if the drugs belonged to Urenda-Bustos or not, and the drugs were in her bag for "a long time," i.e., for "a week" before the incident. ECF No. 29-18 at 39; 31-5 at 93. It is not clear from the transcript of her statement to police whether she corrected herself when she stated the drugs were inside the backpack for a "mont" but then said it had been a "week." *Id.* An objectively reasonable attorney could choose not to question her about it without advance knowledge of her response. The state supreme court was reasonable in its determination that counsel was not deficient in failing to ask Bonifacio whether she told the police she hid the drugs in her backpack. An objectively reasonable attorney could choose not to broach that topic because doing so would open the door to the state eliciting

Bonifacio's testimony on redirect examination that she told the police she hid the drugs in her backpack "for [Urenda-Bustos]" "because [she didn't] want him . . . to get caught with anything." ECF No. 31-5 at 93. Such testimony would not favor Urenda-Bustos's defense that the drugs belonged to Bonifacio. ECF No. 29-21 at 3–5.

The state supreme court also reasonably determined Urenda-Bustos did not demonstrate trial counsel was deficient in failing to elicit Bonifacio' prior statement to police that Gamboa-Cruz was involved in selling drugs or demonstrate that he was prejudiced based on a theory that the methamphetamine found in the kitchen could have belonged to Gamboa-Cruz. ECF No. 52 at 51. Counsel could reasonably anticipate if counsel elicited that testimony, the state on redirect examination would elicit Bonifacio's statement to police that Urenda-Bustos and Gamboa-Cruz were "both" selling drugs. ECF No. 31-5 at 96. Counsel could anticipate the jury would be instructed that possession can be actual or constructive, that "[t]he law recognized that possession may be sole or joint," and a person with "direct physical control over a thing, at a given time is then in actual possession of it," and "[a] defendant may share ownership or control of the place where drugs are found," and it must find the defendant "knew about the presence of the drugs and intended to exercise control over them." ECF No. 29-22 at 38. Ground 2(G)(2) is denied.

A. *Ground 2(H)—The Supreme Court of Nevada was reasonable in its application of Strickland and determination that trial counsel was not ineffective in failing to canvass a juror about whether the juror saw Urenda-Bustos wearing handcuffs.*

Urenda-Bustos alleges trial counsel was ineffective in failing to canvass a juror about whether the juror had observed Urenda-Bustos in handcuffs because visible shackling in the courtroom is inherently prejudicial. ECF No. 52 at 52–53. Urenda-Bustos agrees that canvassing the juror would call attention to Urenda-Bustos's custodial status but claims the canvass could have addressed what the juror saw without referencing the handcuffs or questioning other jurors. ECF No. 89 at 52. The respondents contend there is no evidence the juror saw him in handcuffs; counsel's decision avoided emphasizing Urenda-Bustos was in handcuffs; the jury heard Urenda-Bustos was arrested; and there was overwhelming evidence of his guilt. ECF No. 78 at 28–29.

The United States Supreme Court has held "the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, unless that use is

'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial." *Deck v. Missouri*, 544 U.S. 622, 624 (2005) (emphasis in original) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986)). *See also Grooms v. State*, 96 Nev. 142, 144 (1980) (explaining that "[t]he presumption of innocence is incompatible with the garb of guilt. When such error has occurred, it is our duty to reverse a conviction unless it is clear that the defendant was not prejudiced thereby.").

On the morning before testimony was presented at trial, the state trial court alerted the parties that one of the jurors might have seen Urenda-Bustos in handcuffs; however, defense counsel chose not to canvass the juror explaining that Urenda-Bustos was not wearing handcuffs when Urenda-Bustos entered the courtroom:

> THE COURT: Let me put something on the record. I don't know which one of [the] jurors, we were waiting on a juror, because she hasn't shown up over here, it is 10:15.
>
> Joe came and told me we were missing a juror. As they [were] bringing the Defendant in, the jury, I told not to use the front door, came in the breezeway, and may very well have seen the Defendant in handcuffs.
>
> I don't know if she did or not. I don't know her name.
>
> [THE STATE]: I wouldn't know until they sit down.
>
> [THE STATE]: I think it is Ms. Matheson.
>
> I don't think she even made it through the second doors.
>
> THE MARSHAL: She looked in. As soon as I saw her, I went out there.
>
> THE COURT: She might not have seen anything. If she did see anything, I just need to make sure everybody is aware.
>
> If there is anything that anybody thinks we need to do, if that creates an issue, I can bring her in and instruct her that in the event she had seen anything in the courtroom, she can't disclose that to the jurors.
>
> Do you think it is worth saying?
>
> [THE STATE]: That might emphasize what she may not have seen.
>
> I will leave it up to [defense counsel].
>
> [DEFENSE COUNSEL]: I feel comfortable that we shouldn't bring it up.
>
> I saw him when he entered, and he didn't have handcuffs on.

1

[THE STATE]: We probably better not.

THE COURT: Let's leave it alone.

2

3    ECF No. 29-17 at 3.

4        The Supreme Court of Nevada determined that Urenda-Bustos failed to overcome the

5    strong presumption that counsel's strategic decision was reasonable:

6            [A]ppellant argues that counsel should have inquired further after learning
             that a juror may have seen appellant in handcuffs. Appellant fails to overcome the
7            strong presumption that counsel's strategic decision to avoid questioning the juror
             on this issue was reasonable. We therefore conclude that the district court did not
8            err by denying this claim.

9    ECF No. 31-27 at 6.

10       The state supreme court's determination is objectively reasonable. Urenda-Bustos's claim

11   that trial counsel's decision could not be a reasonable strategic one because of the prejudice

12   inherent in a juror viewing a defendant in handcuffs is contradicted by trial counsel's explanation

13   that counsel was comfortable not canvassing the juror due to counsel's observation that Urenda-

14   Bustos was not wearing handcuffs when he entered the courtroom. Moreover, even assuming

15   counsel's performance was deficient, there is no reasonable probability the result of the proceeding

16   would have been different because the jury received evidence and testimony that Urenda-Bustos

17   was arrested for the charges and there was overwhelming evidence of guilt. Ground 2(H) is denied.

18       B.    *Ground 2(I)—The Supreme Court of Nevada was reasonable in its application of
               Strickland and determination that Urenda-Bustos was not prejudiced by trial*
19             *counsel's failure to object to an instruction, and the state's corresponding closing*
               *remarks, that permitted the jury to convict Urenda-Bustos for kidnapping and*
20             *extortionate collection of debt based on an unlawful natural-and-probable-*
               *consequences theory of coconspirator liability.*
21

22       Urenda-Bustos alleges trial counsel provided ineffective assistance by failing to object to

23   Jury Instruction 13 and failing to object to the state's closing argument relying on the "natural and

24   probable consequence" language in the instruction. ECF No. 52 at 53–56. He alleges the unlawful

25   instruction and the state's corresponding closing argument were prejudicial because they permitted

26   the jury to convict him of specific intent crimes, i.e., kidnapping, and extortionate collection of

27

28

debt, based on an unlawful theory of coconspirator liability.[20] ECF Nos. 52 at 53–56; 89 at 53–56. The respondents contend Urenda-Bustos was not prejudiced because the jury could convict him of the charges under direct and aiding-and-abetting-liability theories. ECF No. 78 at 29–30.

### 1.  Additional Background

The state alleged three theories of liability for the charges against Urenda-Bustos for first-degree kidnapping with the use of a deadly weapon (count 2), robbery with use of a deadly weapon (count 3); and extortionate collection of debt (count 4), namely: (1) that Urenda-Bustos directly committed the crimes; (2) that he aided and abetted Gamboa-Cruz and Lopez-Lauro with the intent to commit the crimes; or (3) by conspiracy to commit the crimes. ECF No. 29-14.

Before closing arguments, the jury was instructed on all three theories of liability. ECF No. 29-22 at 16–22, 40. Juror Instruction 13 incorrectly stated the jury could convict Urenda-Bustos for the acts of Gamboa-Cruz and Lopez-Lauro under a conspiracy theory of liability if he was a member of the conspiracy and the crime was one of the "probable and natural consequences" of the object of the conspiracy:

> Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if the act or the declaration is in furtherance of the object of the conspiracy.
>
> The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators. Every conspirator is legally responsible for a crime that follows as one of the probable and natural consequences of the object of the conspiracy even if it was not intended as part of the original plan and even if he was not present at the time of the commission of such act.

ECF No. 29-22 at 18. The jury was instructed that it could alternatively determine whether the state proved beyond a reasonable doubt that Urenda-Bustos was guilty of the charges based on theories that he was directly liable as a principal or liable as an aider and abettor. *Id.* at 40.

---

[20] Urenda claims trial counsel was ineffective for failing to object to the instruction and that he was prejudiced because robbery is a specific intent crime. ECF No. 52 at 55. In his reply brief in support of the petition, he concedes robbery is instead a general intent crime. ECF No. 89 at 54 n.8. The respondents agree that robbery is a general intent crime. ECF No. 78 at 29 n.4. *See Coats v. State,* 98 Nev. 179, 180, 643 P.2d 1225, 1225–26 (1982) (failing to instruct on specific intent for robbery with the use of a deadly weapon not error because robbery is a specific intent crime).

1    In closing remarks, defense counsel disputed whether the state proved robbery, trafficking,

2    and the use of a deadly weapon, but told the jury the state had proved kidnapping, conspiracy to

3    commit kidnapping, and extortionate collection of debt:

4    [DEFENSE COUNSEL]: [T]his case is about collecting a debt. The prosecution
     did an excellent job showing us that there was a threat made. He went and collected
5    that debt, and he went and he kidnapped this individual.

6    The prosecution did an excellent job. The science proved all of that. The
     Defendant, you have to remember, admitted to all that.
7
8    You are going to be given his statement. You can go back and read that
     statement word-for-word.

9    I am going to give you some highlights to go over. That statement tells you
     that is what happened.
10   . . . .

11   Now, just because they proved a kidnapping, conspiracy to do a kidnapping,
     you have to look at things beyond a reasonable doubt.
12   . . . .

13   You are not allowed to speculate. They are supposed to prove beyond a
     reasonable doubt. They have not done that [for the trafficking charge].
14
15   Did they do that for kidnapping, I agree. They don't do that for this drug
     possession, this trafficking charge.
16   . . . .

17   So, conspiracy to commit kidnapping, like I said, they proved that.
     . . . .
18
     Extortion to collect a debt, well, they got the CD on that one. That's a given.
19   You have the CD right there. They translate it for you.

20   The guy was cussing him out saying I am going to get the money.

21   ECF Nos. 29-1 at 20–21; 29-21 at 3–4, 7.

22   In rebuttal, the state argued the defense conceded the charges of conspiracy, kidnapping,

23   and the extortionate collection of debt. ECF No. 29-21 at 10. The state argued that, under Jury

24   Instruction 13, the jury could find Urenda-Bustos responsible for robbery under a conspiracy

25   theory of liability as the robbery was a probable and natural consequence:

26   They conceded that there was a conspiracy and a kidnapping. There's
     something important in these conspiracy instructions that will make it so that even
27   if the Defendant wasn't aware that the other 2 took property from—this is not what
     the evidence is, but assuming that even if the Defendant didn't know when the
28   property was taken from the victim, conspiracy says, in [Jury Instruction] 13; every

52

conspirator is legally responsible for a crime that follows as one of the probable and the natural consequences of the object of the conspiracy, even if it was not intended as part of the original plan, and even if he was not present at the time of the commission of such act.

It is part of a conspiracy to kidnap. What is the purpose, to collect money or a tire that's owed to him.

Do you think that one of the natural and probable consequences of that kidnapping and the conspiracy is that his property is going to be taken, yes.

So, even if he didn't know, he did order it, by the way. You saw it in his statement. I said search him. He is responsible for the robbery, even if he didn't know that they took it, because it is a natural and a probable consequence of the object of the kidnapping, because the kidnapping was for the purpose of committing extortionate robbery, or just to beat him up.

When you are going back and looking at the evidence in this case, look at the material elements of the robbery, kidnapping and extortion, they did concede to extortion, as well.

ECF No. 29-21 at 10.[21]

### 2. *Additional Legal Principles*

The Supreme Court of Nevada has held that "a defendant may not be held criminally liable for the specific intent crime committed by a coconspirator simply because that crime was a natural and probable consequence of the object of the conspiracy[;]" rather, "[t]o prove a specific intent crime, the State must show that the defendant actually possessed the requisite statutory intent." *Bolden v. State*, 121 Nev. 908, 922 (2005). In *Bolden*, the Supreme Court of Nevada explained that, "[v]icarious coconspirator liability may be properly imposed for general intent crimes," such as robbery,[22] "only when the crime in question was a 'reasonably foreseeable consequence' of the object of the conspiracy." *Id.* at 923. This is because "the mental state required

---

[21] According to the trial court's minutes, after the case was delivered to the jury for deliberation, the state argued the defense conceded the kidnapping and robbery charges for appellate purposes; however, defense counsel objected to the word "conceded," stating, "the facts are there regarding these charges." ECF No. 29-1 at 20. Defense counsel confirmed he and Urenda-Bustos discussed these matters before closing arguments. *Id.* The court queried Urenda-Bustos whether he and his attorney discussed conceding some of the charges, and asked whether Urenda-Bustos conceded some charges had been proven, and whether that was the strategy that Urenda-Bustos and his attorney employed; Urenda-Bustos concurred. *Id.* This part of the trial proceeding was not transcribed. ECF No. 31-25 at 42.

[22] "[R]obbery is defined as the unlawful taking of personal property from the person of another, or in his presence, against his will, by means of force or violence or fear of injury, immediate or future, to his person or property.'" *Cortinas v. State*, 124 Nev. 1013, 1030 (2008) (quoting Nev. Rev. Stat. § 200.380). Robbery is a general intent crime. *See Nelson v. State*, 123 Nev. 534, 549 (2007) (noting robbery is a general intent crime); *Bolden*, 121 Nev. at 914 ("Robbery is not a specific intent crime."); *Litteral v. State*, 97 Nev. 503, 508 (1981) (holding robbery is a general intent crime).

to commit a general intent crime does not raise the same concern as that necessary to commit a specific intent crime" as "general intent is 'the intent to do that which the law prohibits[,]'" and "[i]t is not necessary for the prosecution to prove that the defendant intended the precise harm or the precise result which eventuated." *Id.*

### 3. Analysis of Ground 2(I)

The state supreme court determined trial counsel's failure to object to the instruction constitutes deficient performance, but there is no reasonable probability the result of the proceedings would have been different had counsel objected and the instruction not been given:

> [A]ppellant contends that counsel failed to ensure that the jury was properly instructed regarding coconspirator liability. Appellant asserts that the jury was improperly instructed on the "natural and probable consequences" doctrine rejected in *Bolden v. State,* 121 Nev. 908, 923, 124 P.3d 191, 201 (2005). The State concedes that the jury was improperly instructed, but argues that appellant was not prejudiced. We agree with the State. Counsel should have objected to the instruction, but given the evidence presented at trial, which included the victim's testimony and appellant's admissions, appellant fails to demonstrate a reasonable probability of a different result. We therefore conclude that the district court did not err by denying this claim.

ECF No. 31-27 at 6.

The state supreme court reasonably applied *Strickland* for its determination that trial counsel's failure to object to Jury Instruction 13 constitutes deficient performance but that Urenda-Bustos was not prejudiced. The record shows that defense counsel agreed in closing arguments that the state proved the crimes of kidnapping, conspiracy to commit kidnapping, and extortionate collection of debt. ECF No. 29-1 at 20–21; 29-21 at 3–4, 7. The "natural and probable consequences" language contained in Juror Instruction 13 was improper for purposes of the jury's determinations for those specific-intent crimes. *See Bolden*, 121 Nev. at 923. However, the charge of robbery with use of a deadly weapon required proof of only general intent. *See supra* p. 53 n.22. Even if counsel had objected to Instruction No. 13, the instruction had not been given, and the state had not argued that the instruction supported the robbery conviction, there is no reasonable probability Urenda-Bustos would not have been convicted of robbery with use of a deadly weapon. Cadena-Ambario testified he believed Gamboa-Cruz struck him with a firearm, causing his head to bleed and that Urenda-Bustos and the other two men transported Cadena-Ambario to Urenda-

Bustos's residence, where Gamboa-Cruz and Lopez-Lauro took Cadena-Ambario's wallet, cellphone, and keys while Cadena-Ambario was held with his hands tied, bleeding from his head, and afraid they were going to kill him if he did not give up his vehicle. *See supra* pp. 2–3. Although Urenda-Bustos did not personally take the wallet, cellphone, and keys from Cadena-Ambario, Urenda-Bustos admitted to the police that he directed the kidnapping, hit Cadena-Ambario with a firearm, and directed Gamboa-Cruz and Lopez-Lauro to take the items from Cadena-Ambario. *See supra* p 5–6. Thus, there is no reasonable probability that but for counsel's failure to move to strike the unlawful language from Jury Instruction 13, that Urenda-Bustos would not have been convicted under an aiding and abetting theory of liability. *See supra* pp. 49–53. The state supreme court reasonably determined Urenda-Bustos was not prejudiced by the failure to object to the unlawful language. Urenda-Bustos is not entitled to federal habeas relief for ground 2(I).

C.   *Ground 2(J)—The Supreme Court of Nevada was reasonable in its application of Strickland and determination that trial counsel was not ineffective in failing to object to the state's alleged vouching for Bonifacio during its closing arguments.*

Urenda-Bustos alleges trial counsel was ineffective in failing to object that the prosecutor vouched for, or bolstered, Bonifacio's credibility in closing argument by (1) expressing personal opinion regarding Bonifacio's credibility; and (2) mischaracterizing the evidence by suggesting Urenda-Bustos took advantage of Bonifacio's youth, thereby invoking sympathy for her. ECF Nos. 52 at 57–60. Urenda-Bustos claims there is a reasonable probability that, but for counsel's failure to object, Urenda-Bustos would not have been convicted for the trafficking offense. *Id.* The respondents contend the prosecutor's argument was based on the evidence presented at trial and Urenda-Bustos was not prejudiced due to the overwhelming evidence supporting the trafficking offense against him. 78 at 30–31.

1.   *Additional Background*

Bonifacio was 19 years old at trial. ECF No. 29-18 at 31. Urenda-Bustos, who was nine years older, was her boyfriend for more than three years as of September of 2010. *Id.* They met when she was a 16-year-old, self-described "runaway," and she lived with him for a week, but returned home after the police learned about it, and thereafter continued to see him and stay overnight at his house. *Id.* at 31–33.

Bonifacio testified that on the night of Cadena-Ambario's kidnapping, she saw Urenda-Bustos place "drugs and money" in her backpack. *Id.* at 33. She said the drugs looked like "a bag of white crystal" and she identified a photograph of the drugs and described the drugs as "crystal meth." *Id.* at 33, 36. She testified that Urenda-Bustos told her there was $4,000 in the backpack. *Id.* She said Urenda-Bustos told her to take the backpack, and some rifles, to her mother's house because the police were coming. *Id.* She said she did not ever touch the backpack or look inside it again after she took it to her mother's house where she left it in the car. *Id.* at 33–35. She said Gamboa-Cruz retrieved the car containing the rifles and backpack with the cash and drugs and she later saw her backpack in Urenda-Bustos's bedroom where it was seized by the police. *Id.*

Bonifacio claimed she had not seen Urenda-Bustos with methamphetamine before he placed it in her backpack. *Id.* at 36, 38. She identified the drugs she saw Urenda-Bustos place in her backpack as crystal methamphetamine because she said she knew what it looked like from "school, books" in the library, and because, unlike cocaine or heroin, it was "hard." *Id.* She claimed that she never used crystal methamphetamine and did not see Urenda-Bustos use it. *Id.* On cross-examination, Bonifacio agreed that she told police she did not know whether the drugs belonged to Urenda-Bustos or not and that the drugs were in her backpack for a week before the night of the incident with Cadena-Ambario. *Id.* at 39.

In closing arguments to the jury, the state argued:

> But remember the testimony about the backpack, Melriz Bonifacio, the girlfriend who said she is 19, was an 18-year-old [sic] runaway when she met the Defendant, who was nine years older than her. He ordered her to take the rifles out to the car. He took her backpack out to the car. She saw him put the drugs in there, and she said there was $4,000 in that backpack, and he ordered her to take the car, and Mario Gamboa-Cruz would be over to take care of that.

> Sure enough, that is what Mario Gamboa-Cruz did was take care of it. He got rid of the guns . . . .

> He's not going to get rid of $4,000, is he?

> He's not going to get rid of drugs which are so valuable.

> So we'll get to this more as to why you might hear some argument they were her drugs.

> How does an [sic] 19 year old runaway girl have $4,000 and three ounces of methamphetamine?

That makes no sense.

It makes sense that he, knowing the police were onto him, if he got caught, put it in her backpack, make it look like it's hers, he's the one remember who there was testimony by [Cadena-Ambario] that he had seen them doing drug stuff before, like packaging up drugs, like you got to know what you are doing and be sophisticated, plan for stuff like this, why not put it in the girlfriend's backpack.

There's no way that a 19 year old runaway has $4,000 in all this mess.

It was his. He put it there, sort of knew what was coming, or was afraid of what was coming, and he had the ability to control her, right, or to influence her and tell her what to do.

Also, let's not forget the methamphetamine in the Defendant's house, in the kitchen right above where he was seen getting the other drugs and hiding them, right above there this other methamphetamine.
. . . .

In this case we're talking about the Defendant's own house, where it was put you recall by the Defendant in the backpack of the 19 year old runaway, knowing that the police are coming.

Now, who has the intention or the power to control that backpack?

Well, we know who has the intention to keep that $4,000, to put it in there, and we know she doesn't have it, it's not her money.

So why would he—Let's say his own $4,000. If you believe what the Defense will probably argue, it was her drugs, why would you put your $4,000 in there with her drugs if it's hers?

And if it is hers, why not just run away with it?

Hey, I got the meth and the $4,000.

That is not all what [sic] happened.

We knew what was coming, kind of like they use mules to carry drugs. He used her to mitigate the risks.

He was sophisticated enough to be getting bricks of marijuana, chopping it up for sale, as the testimony was in the case.

Don't think for a minute he wasn't sophisticated enough to know, well, if the cops come in, why not put it in the young—the person who can take the fall, or afford the fall, the person who is nine years younger than him, the runaway. That is what he did. And that is what the testimony was.

It's his drugs. He had constructive possession of it. He had the ability to just, like he said, take it—How do we know he had control over it?

He already exercised control over it. He told her to take it to the house, and have [Gamboa-Cruz] come get it.

1

> Yeah, it's her backpack, her ID is in the backpack. But that is by design.

2 ECF No. 29-20 at 7, 14.

3   Defense counsel responded in closing that the state had not proved beyond a reasonable

4 doubt the drugs belonged to Urenda-Bustos and that the drugs belonged to Bonifacio:

5

> Okay. The first one that we are going to look at is the drug trafficking charge. You can't tell me that beyond a reasonable doubt that that was [Urenda-Bustos]'s drugs. You can't tell me that.

6

7

> Here is why; the first reason is what she said at the very end of her testimony. I saved it for the very end was; the drugs were in her backpack for a whole week.

8

9

> This wasn't like the guns, where they said, let's get them out of the house real quick. Those drugs were in a backpack for whole week. That's the first thing.

10

11

> The second thing is, there was four thousand dollars in there. That's what she testified to. That's what our prosecutor said.

12

> There was four thousand dollars in that backpack. If you recall, when the CSA person counted it all out, there [sic] $3,500.

13

14

> Who brought that backpack back? That was her backpack. It had her stuff in it. It had her identification in it.
> . . . .

15

16

> [T]he other thing is she readily identified that as crystal meth. She readily identified it.

17

> She goes, when that picture came up on the screen, that is crystal meth; how does she know what crystal meth is.

18

19

> She testified that she never saw [Urenda-Bustos] around crystal meth before.

20 ECF No. 29-21 at 4–5.

21   The state, in rebuttal, argued:

22

> [B]ut the first thing I disagree with was; Melriz, I believe she said, and I could be wrong, she was 16 when she first ran away, okay, a little bit more impressionable than an 18-year-old.

23

24

> She hooked up with this Defendant, and a girl 9 years his junior is going to be the master mind of these drug operations.

25

26

> She was basically his pet, a runaway, 16 years old. I will throw him [sic] in there so that I can blame her later on if this ever comes to fruition, the police come up with me.

27

28 *Id.* at 8.

1          2.        *Applicable Legal Principles*

2          The Supreme Court has warned two dangers are posed when a prosecutor vouches for the

3   credibility of a witness and expresses a personal opinion on the guilt of the accused: (1) "such

4   comments can convey the impression that evidence not presented to the jury, but known to the

5   prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's

6   right to be tried solely on the basis of the evidence presented to the jury;" and (2) "the prosecutor's

7   opinion carries with it the imprimatur of the Government and may induce the jury to trust the

8   Government's judgment rather than its own view of the evidence." *United States v. Young*, 470

9   U.S. 1, 18–19 (1985) (citing *Berger v. United States*, 295 U.S. 78, 88–89 (1935)).

10         For purposes of determining whether the prosecution engaged in misconduct by vouching

11  for a witness, the ninth circuit court of appeals has stated a court must consider (1) the form of

12  vouching; (2) how much the vouching implies the prosecutor has extra-record knowledge of or a

13  capacity to monitor the witness's truthfulness; (3) inferences that the court is monitoring the

14  witness's veracity; (4) the degree of personal opinion asserted; (5) the timing of the vouching; (6)

15  the extent to which the witness's credibility was attacked; (7) the specificity and timing of a

16  curative instruction; and (8) the importance of the witness's testimony and the vouching to the case

17  overall. *See United States v. Necoechea*, 986 F.2d 1273, 1278 (9th Cir. 1993).

18         To determine whether a prosecutor's comments rise to the level of a due process violation,

19  courts examine the prosecutor's remarks in the context in which they are made. *See Boyde v.*

20  *California*, 494 U.S. 370, 385 (1990). Factors to consider when determining whether a

21  prosecutor's comment "rendered a trial constitutionally unfair," include: (1) whether the comment

22  misstated or manipulated the evidence; (2) whether the judge admonished the jury to disregard the

23  comment; (3) whether defense counsel invited the comment; (4) whether defense counsel had an

24  adequate opportunity to rebut the comment; (5) the prominence of the comment in the context of

25  the entire trial; and (6) the weight of the evidence. *See Hein v. Sullivan*, 601 F.3d 897, 912–13 (9th

26  Cir. 2010) (citing *Darden v. Wainwright*, 477 U.S. 168, 182 (1986)).

27         To warrant habeas relief, acts of prosecutorial misconduct must have "so infected the trial

28  with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at

181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). The standard is general, leaving courts "more leeway . . . in reaching outcomes in case-by-case determinations . . . ." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarborough*, 541 U.S. at 664).

### 3.   Analysis of Ground 2(J)

The Supreme Court of Nevada determined Urenda-Bustos failed to overcome the presumption that counsel's failure to object was a reasoned tactical decision or demonstrate prejudice:

> [A]ppellant argues that counsel should have objected when the prosecutor asked leading questions, vouched for a witness, elicited character evidence, and engaged in speculation. Most of the comments appellant points to were not objectionable on these grounds. Even if they were, appellant fails to overcome the presumption that counsel's failure to object was a reasoned tactical decision. Appellant also fails to demonstrate prejudice. We therefore conclude that the district court did not err by denying this claim.

ECF No. 31-27 at 5.

Urenda-Bustos contends trial counsel was ineffective in failing to object to a number of the prosecutor's above closing and rebuttal remarks. He claims the remark, "How does a 19-year old runaway girl have $4,000 and three ounces of methamphetamine? That makes no sense," was objectionable because it bolstered Bonifacio's character. ECF No. 52 at 57. He likewise claims the prosecutor improperly bolstered Bonifacio's character by arguing:

> Don't think for a minute he wasn't sophisticated enough to know, well, if the cops come in, why not put it in the young—the person who can take the fall, or afford the fall, the person who is nine years younger than him, the runaway. That is what he did. And that is what the testimony was.

*Id.* He claims the rebuttal argument improperly invoked sympathy for Bonifacio. *Id.* at 58. He contends counsel should have objected to the repeated references to Bonifacio as a "runaway" because Bonifacio testified she was a runaway three years prior to the time the police found the methamphetamine in her backpack at Urenda-Bustos's house. *Id.* He contends trial counsel should have objected to the prosecutor's arguments portraying Bonifacio as an unsophisticated, unsuspecting youth because Bonifacio testified that she knew how to identify methamphetamine. *Id.* at 59. He contends counsel should have objected to the argument that Urenda-Bustos took advantage of, or somehow coerced, Bonifacio. *Id.* He claims counsel should have objected to the

argument that Urenda-Bustos took advantage of Bonifacio because of her youth and innocence, as there was no evidence he took advantage of her, and the argument improperly vouched for Bonifacio. *Id.* He claims counsel should have objected to the state's argument because it mischaracterized the evidence to bolster her credibility. *Id.*

The record shows, however, that the prosecutor's argument was based on Bonifacio's testimony and inferences that could be drawn from her testimony. *See supra* pp. 4, 55–58. And the state's rebuttal responded to defense closing argument that the drugs belonged to Bonifacio. *Id.* The prosecutor's arguments did not convey that the prosecutor was privy to extra-record knowledge of, or a capacity to monitor, Bonifacio's truthfulness. The defense had an opportunity to rebut the prosecutor's opening remarks, and to the extent the prosecutor engaged in unwarranted hyperbole, the jury was instructed that counsel's opinions and statements during closing remarks were not evidence and the jurors must rely upon their own memories of the evidence. ECF Nos. 29-16 at 31; 29-20 at 4; 29-22 at 13, 47. The state supreme court was reasonable in its application of *Strickland* and the determination that Urenda-Bustos did not establish trial counsel was ineffective in failing to object to the prosecutor's closing arguments. Ground 2(J) is denied.

A.      *Grounds 3(A)–(G)—Ineffective Assistance of Appellate Counsel*

Urenda-Bustos alleges appellate counsel, who was the same attorney who represented him for trial, provided ineffective assistance for his appeal by (A) tardy filing of a docketing statement, opening brief, and appendix; and failing to raise the following six claims for the direct appeal:

(B)      Whether four out of five African-American venireperson were improperly struck by the state or dismissed by the court under *Batson*;

(C)      Whether evidence should have been suppressed because the search executed pursuant to the first (homicide) warrant by robbery detectives was actually used to investigate the alleged robbery/kidnapping for which no warrant had been issued;

(D)      Whether Urenda-Bustos's confession should have been suppressed in light of his unlawful arrest without a prompt probable cause determination by a neutral judicial officer;

(E)      Whether improper questioning by the state resulted in the admission of evidence that should have been excluded, resulting in an unfair trial;

(F)     Whether, after exclusion of evidence improperly admitted at trial, there was sufficient factual support for the kidnapping conviction and especially the trafficking conviction; and

(G)     Whether the improper statement of law found in Jury Instruction 13 and the closely-related closing arguments made by the state in reliance on that improper statement of law tainted the verdict of the trial court by inviting the jury to convict Urenda-Bustos on the now-rejected theory that he was criminally responsible for the natural consequences flowing from a conspiracy, even if no evidence showed that Urenda-Bustos foresaw such consequences, intended for them to occur, or ever learned that they had occurred.

ECF No. 52 at 60–66.

### 1.     Grounds 3(D) and (F) are dismissed as procedurally defaulted.

The respondents contend grounds 3(D) and (F) are conclusory, unexhausted, and should be dismissed to the extent Urenda-Bustos claims they are technically exhausted by procedural default. ECF No. 78 at 32–33 n.9. Urenda-Bustos concedes grounds 3(D) and (F) are unexhausted and procedurally defaulted. ECF No. 89 at 60 n.9. Grounds 3(D) and (F) are dismissed as procedurally defaulted because Urenda-Bustos fails to demonstrate cause and prejudice to overcome the default. *See Coleman*, 501 U.S. at 750 (holding federal habeas relief for a defaulted claim is barred unless petitioner demonstrates cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrates failure to consider the claims will result in a fundamental miscarriage of justice). *See also Davila v. Davis*, 582 U.S. 521 (2017) (holding federal habeas courts may not entertain defaulted claims of ineffective assistance of appellate counsel). Grounds 3(D) and (F) are dismissed.

### 2.     Supreme Court of Nevada's Determinations on Exhausted Claims

The Supreme Court of Nevada determined appellant counsel was not ineffective for missing deadlines (ground 3(A)), or failing to raise grounds 3(B), 3(C), 3(E) and 3(G):[23]

[A]ppellant contends that counsel should have argued on appeal that the State violated *Batson v. Kentucky*, 476 U.S. 79 (1986), during jury selection. Because the trial court credited the prosecutor's race-neutral reasons, there is not a reasonable probability that counsel could have successfully challenged the trial court's decision on appeal. *See Hawkins v. State*, 127 Nev. 575, 577, 256 P.3d 965, 966 (2011) (giving deference to the district court's decision on the question of discriminatory intent in reviewing a *Batson* claim). We therefore conclude that the district court did not err by denying this claim.

---

[23] The claims alleged in Grounds 3(A), (B), (C), (E), and (G) were raised in the initial state postconviction petition (ECF No. 31-5 at 52–56) and exhausted on appeal from the denial of that petition (ECF No. 31-24 at 54–57).

[FN 4] We reject appellant's assertion that appellate counsel was ineffective for failing to raise all the issues referenced herein or for missing deadlines. We also reject appellant's assertion that cumulative error entitles him to relief because although counsel should have objected to the inaccurate conspiracy instruction, one error cannot be cumulated. *See U.S. v. Sager,* 227 F.3d 1138, 1149 (9th Cir. 2000).

ECF No. 31-27 at 7.

    *3.       Analysis of Ground 3(A)—The Supreme Court of Nevada was reasonable in its application of Strickland and determination that trial counsel was not ineffective in alleged tardy filings for the direct appeal.*

On December 27, 2011, appellate counsel timely filed a notice of appeal and case appeal statement. ECF Nos. 29-25; 29-26. On January 26, 2012, the Supreme Court of Nevada issued a notice to file a docketing statement within 10 days. ECF No. 29-27. The clerk of that court received the docketing statement on February 17, 2012 (ECF No. 29-29), but later issued an order on February 21, 2012, giving appellate counsel ten days to file the docketing statement or incur sanctions. ECF No. 29–28. On February 22, 2012, the Supreme Court of Nevada filed the docketing statement that it had received on February 17, 2012. ECF No. 29-29.

On May 7, 2012, the Supreme Court of Nevada issued a notice to appellate counsel to file the opening brief and appendix within 15 days. ECF No. 29-30. On May 24, 2012, Urenda-Bustos's counsel filed a motion for an extension of time to July 22, 2012, to file the opening brief and appendix because counsel had not received all of the trial transcripts. ECF No. 30-1. On May 25, 2012, the Supreme Court of Nevada granted the motion for extension of time while noting that, although trial transcripts were ordered in December of 2011, the transcript order was directed to only one of two reporters who had reported the trial. ECF No. 30-2 at 2–3. The Supreme Court of Nevada ordered appellate counsel to rectify the transcript order within 10 days. *Id.* Urenda-Bustos's counsel subsequently moved for two extensions of time to file the opening brief and appendix and the Supreme Court of Nevada granted those motions, extending the deadline to November 22, 2012. ECF Nos. 30-5; 30-6; 30-9; 30-10.

On December 4, 2012, the Supreme Court of Nevada issued an order directing appellate counsel to file the opening brief and appendix and conditionally sanctioning appellate counsel if they were not filed within 10 days. ECF No. 30-11. On December 17, 2012, the clerk of that court

received from appellate counsel a certificate of extreme hardship under Nev. R. App. P. 30(f)(2) requesting a waiver of the requirement that appellate counsel produce a CD-ROM version of the appendix. ECF No. 30-12. On December 26, 2012, the Supreme Court of Nevada issued a notice to file the opening brief and appendix within 15 days under pain of imposition of sanctions including dismissal of the appeal. ECF No. 30-13. The Supreme Court of Nevada received the opening brief on January 14, 2013. ECF No. 30-15. On January 17, 2013, the Supreme Court of Nevada received appellate counsel's belated motion to extend the time to file the opening brief to January 17, 2013. ECF No. 30-14. The motion was granted (ECF No. 30-16) and the opening brief was filed on January 30, 2013. ECF No. 30-15.

The state supreme court reasonably concluded Urenda-Bustos failed to demonstrate a basis to conclude that appellate counsel's performance was deficient or resulting prejudice under *Strickland*. ECF No. 31-27 at 7 n4. Assuming arguendo, that appellate counsel's failure to file the docketing statement, opening brief, and appendix, at the earliest possible deadlines could be construed as deficient performance, there is no reasonable probability the result of the proceeding would have been different had appellate counsel earlier filed those documents as the Supreme Court of Nevada accepted the filings and considered the appeal. Ground 3(A) is denied.

> *4.     Ground 3(B)—The Supreme Court of Nevada's determination that trial counsel was not ineffective in failing to pursue a claim that the trial court erred in overruling the Batson objection was reasonable as to three venirepersons; however there is clear and convincing evidence in the record that the state supreme court's application of Strickland and determination as to a fourth venireperson is based on an objectively unreasonable determination of fact and habeas relief is warranted.*

Urenda-Bustos alleges appellate counsel rendered ineffective assistance by failing to pursue a claim under *Batson* that the state engaged in purposeful race discrimination by exercising peremptory challenges against two African-American venirepersons, Katherine Duncan-Briley (ground 3(B)(1)) and Sharee Nock (ground 3(B)(4)), and by supporting the trial court's excusal of two additional African-American venirepersons Robert Owens (ground 3(B)(2)) and Barry Hill (ground 3(B)(3)), by emphasizing job-related reasons for their excusal by the trial court, as

compared to a non-African-American venireperson, leaving one African-American on the jury.[24] ECF Nos. 52 at 64–66; 89 at 61–65. Urenda-Bustos alleges a comparative juror analysis establishes the state's reasons for exercising the peremptory challenges were pretextual and the state engaged in purposeful discrimination during the jury selection process. *Id.* The respondents contend the *Batson* claim would not have succeeded on appeal as there was no pattern of discrimination, the state gave race-neutral reasons for striking the venirepersons, and the trial judge did not find a *Batson* violation or discriminatory intent. ECF No. 78 at 31–32.

The state supreme court reasonably determined that appellate counsel was not ineffective in failing to pursue a *Batson* claim for three out of the four African-American venirepersons, i.e., for Duncan-Briley (ground 3(B)(1)), Owens (ground 3(B)(2)), and Hill (ground 3(B)(3)), because there is no reasonable probability the claims would have succeeded on appeal. However, the state supreme court's determination that appellate counsel was not ineffective in failing to pursue a *Batson* claim based on the state's exercise of a peremptory challenge for a fourth venireperson, i.e., Nock (ground 3(B)(4)), is, by clear and convincing evidence contained in the state court's record, based on an unreasonable determination of fact in light of the evidence presented in the state court's proceedings. 28 U.S.C. § 2254(d)(2), (e)(1). And, applying de novo review, the court finds appellate counsel's failure to pursue the *Batson* claim for the excusal of venireperson Nock is deficient and prejudicial under *Smith* and *Strickland*. Thus, the court grants a writ of habeas corpus on ground 3(B)(4), vacates the judgment, and reverses and remands for a new trial.

### a.   Additional Background

The jury pool had 31 members, five who were African-American (16%). ECF No. 29-2 at 3. The jury ultimately, including one alternate, was comprised of 13 members, one who was African-American (7%). *Id.* The state-court record shows the state independently questioned eleven prospective jurors, including four of the five (80%) African-American venirepersons (all except Hill). ECF No. 29-16 at 17–21. Thus, the state questioned seven non-African-American

---

[24] The state struck two of the three African-American venirepersons leaving one African-American on the jury. *See infra* pp. 66, 69 n.25; ECF No. 29-2 at 3. The fact that the jury included one African-American juror and several Hispanic jurors, does not mitigate the effect of a discriminatory peremptory challenge. *Turner v. Marshall*, 121 F.3d 1248, 1254 n.3 (9th Cir. 1997).

venirepersons out of a total of 11; 36% were African-American. *Id.* The state exercised six (not nine) peremptory challenges; two of them (33%) were exercised against African-American venirepersons. ECF No. 29-2 at 3. With its peremptory challenges, the state struck two (40%) of the total of five African-American venirepersons. Setting aside the two venirepersons struck by the trial court, the state excused two of the three remaining African-American venirepersons; i.e., approximately 66%. *Id.*

After the jury was sworn, the defense tendered a *Batson* objection based on the state's peremptory challenge to two African-American venirepersons, and allegations that the state pressed for the trial court's excusal of an additional two African-American venirepersons, leaving only one African-American juror of the total of five who had participated in jury selection. ECF No. 29-16 at 29. The trial court overruled the objections, stating, there were "no abuses of challenges," no violation, and no reason to declare a mistrial:

> [DEFENSE COUNSEL]: [I] would like to bring a *Batson* challenge in regards to the jury panel.
>
> There are 5 [A]frican-American jurors. I have all of their numbers.
>
> Sher[ee] Noc[k] is African-American.
>
> Katherine Duncan-Briley is African-American.
>
> Robert Owen[s] is an African-American.
>
> And Barry Hill.
>
> There's one that remains on the panel, Roshanda Tillman. Outside of that, my argument would be that they were stricken for racially biased reasons.
>
> For the record, I as counsel for [Urenda-Bustos] is [sic] also an African-American, I believe, so there wouldn't be any balance swayed in our favor, because of the African-American decent of those jurors that were stricken, that they were dismissed.
>
> In regards to Sher[ee] Nock and Katherine Duncan-Briley, these were stricken by the State based on their peremptory challenges.
>
> I would also note for the record that in regards to Robert Owens and to Barry Hill, even though these individuals were excused by the Court for job reasoning [sic], both worked at night.
>
> I believe that the prosecution pressed the issue more so on these individuals, while yet Maria Cariaso, an employee of Hispanic decent that also had

complications in regards to her work, there was [sic] no questions addressed in regards to those complications.

Finally, for the record, also the race of [Urenda-Bustos] is also Hispanic.

THE COURT: Okay. The objection is noted. Does the State want to respond?

[THE STATE]: Well, the [sic] *Batson* requires that the Defendant make out a prima facie case of discrimination.

Before we get any further, I don't think we have shown that. The 2 that he mentioned, Mr. Owens and Mr. Hill, they were excused by the Court.

That's not the State's doing; and, yes, of the 9 pre-emptory [sic] we used, 2 of them were on African-American women.

However we used the balance—we used all of them in a racially neutral way. If there were a pattern, Judge, you would have seen like Mr. Arnold did, strike all Caucasians.

He mentioned about Cariaso, we don't know if she is Hispanic or Filipino. I believe she is a Filipino nurse sitting on the jury.

There is another Hispanic nurse on the jury.

There's a Hispanic man on the jury, Mr. Martinez, and Mr. Diaz, so he hasn't shown a prima facie case of discrimination.

If that were the case, we would have struck all African-American and Hispanics, and if [sic] even if the Court finds, prong one that there is a pattern, we would tender race neutral reasons for it.

THE COURT: Just to make sure the record is clear, assuming that there is a pattern, my understanding is, this has always been my understanding, that you would need to articulate a race neutral reason for exercising your challenge.

Why don't you just put on the record what you consider to be the race neutral reason for the challenge, and then we will have a complete record of the objection, and your complete and full response, not only that it doesn't apply, but you have a reason anyway.

[THE STATE]: I am not conceding that there is a pattern, Judge. The race neutral reason for striking, we will start with Ms. Duncan-Briley, who is an African-American woman.

She had been arrested or charged with battery domestic violence. She also had a brother who had been in prison.

We didn't think that was an appropriate person to have on the jury.

We also, for similar reasons, Michael Bjanowski, 056 was struck for having a relative in prison, a former sheriff or a sheriff's deputy.

Ms. Nock, I believe it was, seated in position number 2, Badge 004. Throughout the proceedings her body language was poor.

67

There were a couple of light moments during the selection, and not once did she laugh. She had a scowl on her face for the duration of the selection proceedings.

THE COURT: She didn't like my jokes?

[THE STATE]: Or mine.

She also was one of the jurors who was, when you asked about CSI, she was a fan of CSI; so, for both of those reasons.

I should review the balance of our—the balance, we struck Ms. Patel.

Is there a challenge with respect to all of them.

THE COURT: I think it was just the race issues as to like whatever, those 3 people.

[THE STATE]: The 2 African-Americans, I think we just described.

THE COURT: All right. Is there anything else we need to put on the record?

[THE STATE]: Actually, if I can add, we didn't strike a single Hispanic person, which is the race of the Defendant.

[DEFENSE COUNSEL]: Just a couple more things.

For the record, Your Honor, again, there were 5 African-Americans on the panel.

2 of them were stricken by the Court for employment reasons. However, out of the 3 that were remaining, 2 were stricken.

In regards to Ms. Nock, the Defense would argue that the reasoning is protectional, in so [sic] that there are many other individuals on the jury panel that the defense observed that also weren't laughing at jokes, or also responded to the CSI comments.

Specifically, my observations were in regards to the younger panel members that I described, Ryan Tapper, Kris Patel and Aa[r]on Beckman, that probably wouldn't understand some of the jokes.

Outside of that, that being it, we would submit.

THE COURT: I think everybody has made a record. I don't find that there has been any abuse of challenges, and the Court will so find.

I think that the way we do these [sic] jury selection process at this point, if I am of the opinion that there's been a substantial violation in the jury selection process, and a *Batson* violation in regards to a pattern of elimination of race bias potential jurors, that I would be required to go through the selection process and excuse the juror.

I would be required basically to declare a mistrial and get another jury panel.

That's what I always understood would be my options. And I don't find that there has been a violation here.

I don't find that there's any reason to declare a mistrial here and start over.

I will say, just by way of comment, that when you use the old selection [sic] of jury selection, where you go through, and I question each juror, and then you guys question each juror, and then that juror is passed for cause.

And then you go back, and you come up here 1 at a time that the State exercises a challenge, the defense exercises a challenge, and we excuse those 2 folks, and we go through the process all over again.

When you do it like that, I think it is a little more cumbersome, but at the same time, I think in regards to *Batson* type challenges they can be addressed immediately, and I don't think you run into this problem.

I don't think you have to declare a mistrial. If I was of the opinion that I was witnessing *Batson* violations as we picked the jury, I could correct it right then.

I could say, you can't dismiss that juror. You can't challenge that juror without a non-race specific reason being able to articulate it, then I am not going to allow your challenge.

But when you do this Arizona selection process, it is virtually impossible to do anything except declare a mistrial, if I saw it happening; am I right or wrong?

[THE STATE]: That's correct, Your Honor.

THE COURT: Do you use the old system often?

[THE STATE]: I have only done that once or twice. One was with Stu Bell.

THE COURT: The older guys are more accustomed to do it like that.

I just started doing the Arizona way, I have up until this last year.

In any event, we can go off the record.

Is there anything else we need to address before we bring in the jury?

[THE STATE]: Nothing from the State.

[DEFENSE COUNSEL]: Not for the Defense, Your Honor.

ECF No. 29-16 at 25–30.[25]

### b.    Applicable Legal Principles

To determine whether appellate counsel's failure to raise a *Batson* claim on direct appeal was objectively unreasonable and prejudicial, a court must first assess the merits of the *Batson*

---

[25] African-American juror Roshanda Tillman was a child protective services investigator for four months and had worked with the Department of Family Services for about 11 years. ECF No. 29-16 at 6. She occasionally worked closely with the police and went to court. *Id.* at 6, 18. Her father was a retired probation officer from the Department of Juvenile Justice. *Id.* at 7.

claim. *See Moormann v. Ryan*, 628 F.3d 1102, 1106–07 (9th Cir. 2010); *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) ("appellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal."). "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). *See also McCarty v. State*, 132 Nev. 218, 226 (2016); *Hawkins v. State*, 127 Nev. 575, 577 (2011) (explaining that appellate review of a *Batson* ruling gives deference to "[t]he trial court's decision on the ultimate question of discriminatory intent").

The Supreme Court in *Batson* held the Equal Protection Clause of the Fourteenth Amendment prohibits prosecutors from exercising peremptory challenges on the basis of race. *See Batson*, 476 U.S. at 89. "[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose." *See Snyder*, 552 U.S. at 478 (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)). A defendant of any race may raise a *Batson* claim, and a defendant may raise a *Batson* claim even if the defendant and the excluded juror are of different races. *Flowers v. Mississippi*, 588 U.S. 284, 301 (2019) (citing *Hernandez v. State of Tex.*, 347 U.S. 475, 477–78 (1954) and *Powers v. Ohio*, 499 U.S. 400, 406 (1991)).

"*Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race[:]"

> First, a defendant must make out a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecutor must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder*, 552 U.S. at 476–77 (internal punctuation and citations omitted).

If a trial court finds a defendant made a prima facie showing that a peremptory challenge was exercised on the basis of race, "[t]he prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challeng[e]." *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) (quoting *Batson*, 476 U.S. at 98 (internal quotation marks omitted)). If the state gives reasons for its peremptory challenges before a trial court determines whether the opponent of the challenge made a prima facie showing of discrimination, the first *Batson* step is considered

moot for appellate purposes. *See Ford v. State*, 122 Nev. 398, 403 (2006). "The second step of this process does not demand an explanation that is persuasive, or even plausible[;]" rather, "the issue is the facial validity of the prosecutor's explanation." *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* "Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility," and "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." *Snyder*, 552 U.S. at 477 (internal citations omitted). In step three, a pretextual explanation for exercising a peremptory challenge raises an inference of discriminatory intent. *See id.* at 485.

The Supreme Court recently summarized a list of factors that it previously ruled may be considered in determining whether a *Batson* violation occurred: (1) "statistical evidence about the prosecutor's use of peremptory strikes against [African-American] prospective jurors as compared to [non-African-American] prospective jurors in the case;" (2) "evidence of a prosecutor's disparate questioning and investigation of [African-American] and [non-African-American] prospective jurors in the case;" (3) "side-by-side comparisons" of African-American prospective jurors who were struck and non-African-American prospective jurors who were not struck in the case; (4) a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing; (5) relevant history of the state's peremptory strikes in past cases; and (6) other relevant circumstances that bear upon the issue of racial discrimination. *See Flowers*, 588 U.S. at 301–02 (citations to earlier cases omitted). "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

Whether a peremptory strike was motivated by race is ultimately a question of fact. *See Miller-El*, 545 U.S. at 240. When considering a *Batson* determination, "[a] federal habeas court must accept a state-court finding unless it was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Davis*, 576 U.S. at 271 (internal quotation marks omitted) (citing 28 U.S.C. § 2254(d)(2)). *See also Hernandez v. New York*, 500 U.S. 352, 364–66 (1991) (explaining that § 2254(d)(2) applies to the district court's determination whether the prosecutor's strikes were purposefully discriminatory because that determination is an

71

issue of fact). In evaluating habeas petitions premised on a *Batson* violation, review is doubly deferential: "unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence," it must be upheld. *See Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013). *See also Sifuentes v. Brazelton*, 825 F.3d 506, 518 (9th Cir. 2016) (explaining that review is doubly deferential because a federal court defers to the state reviewing court's determination of the facts, and a reviewing court defers to the trial court's determination of the prosecutor's credibility).

According to the ninth circuit court of appeals, a federal habeas court applying doubly deferential review to a state court's *Batson* factual findings, must, if the state court did not do so, first perform a comparative-juror analysis, and consider the factors listed in *Flowers, see supra* p. 71, and then reevaluate the ultimate decision in light of the comparative analysis and any other evidence tending to show purposeful discrimination. *See McDaniels v. Kirkland*, 813 F.3d 770, 778 (9th Cir. 2015) ("A federal court on habeas review of a *Batson* claim must consider the totality of the relevant facts about a prosecutor's conduct to determine whether the state court reasonably resolved *Batson*'s final step.") (quoting in part *Miller–El*, 545 U.S. at, 239) (internal quotation marks omitted). *See also Jamerson*, 713 F.3d at 1225–26 (holding a federal habeas court must perform in the first instance the comparative analysis that the state court declined to pursue and then reevaluate the ultimate state decision in light of this comparative analysis and any other evidence tending to show purposeful discrimination to decide whether the state was unreasonable in finding the prosecutor's race-neutral justifications to be genuine). *See, e.g., Ervin v. Davis*, 12 F.4th 1102, 1108 (9th Cir. 2021) (remanding to the federal district court to evaluate *Batson* claims in light of the Supreme Court's guidance in *Flowers*).

The ninth circuit has explained that *"Miller-El* itself demonstrated that a comparative juror analysis may be relevant to, if not dispositive of, a federal court's § 2254(d)(2) analysis in the context of a *Batson* claim." *McDaniels*, 813 F.3d at 779. "The Supreme Court [in *Miller-El*] conducted a comparative juror analysis in the first instance in the course of analyzing the reasonableness of the state court's factual determinations under § 2254(d)(2)." *Id.* (citing *Miller-El*, 545 U.S. at 240–52). "These side-by-side panelist comparisons, along with other circumstantial

evidence of discriminatory intent, led the Supreme Court to conclude [in *Miller-El*] that the state court's finding that the juror strikes were not racially motivated was 'unreasonable as well as erroneous.'" *Id.* (citing *Miller-El*, 545 U.S. at 266).

*c.*     *Supreme Court of Nevada's Determination*

The Supreme Court of Nevada determined there is no reasonable probability appellate counsel could have successfully challenged the trial court's *Batson* decision on appeal because the trial court credited the prosecutor's race-neutral reasons for excusing the prospective jurors:

> [A]ppellant contends that counsel should have argued on appeal that the State violated *Batson v. Kentucky*, 476 U.S. 79 (1986), during jury selection. Because the trial court credited the prosecutor's race-neutral reasons, there is not a reasonable probability that counsel could have successfully challenged the trial court's decision on appeal. *See Hawkins v. State*, 127 Nev. 575, 577, 256 P.3d 965, 966 (2011) (giving defense to the district court's decision on the question of discriminatory intent in reviewing a *Batson* claim). We therefore conclude that the district court did not err by denying this claim.

ECF No. 31-27 at 7 (footnote addressing other claims omitted).

> *d.*     *Ground 3(B)(1)—The Supreme Court of Nevada reasonably determined appellate counsel was not ineffective in failing to pursue a Batson claim as to the state's peremptory challenge of venireperson Duncan-Briley.*

African-American venireperson Duncan-Briley disclosed that she worked as "security for a year at the Nevada Test Site" in 1985, her sister "was on the North Las Vegas Police Department," and her brother-in-law worked at the correctional center in Indian Springs. ECF No. 29-15 at 32. She disclosed that she was previously charged with domestic battery in Las Vegas, but that the case was dropped. *Id.* at 32–33. She also disclosed that her brother "has done time," for a conviction that arose over his failure to turn in money that was involved with drugs:

[THE STATE]: Ms. Duncan?

THE PROSPECTIVE JUROR: Yes.

[THE STATE]: You said that your brother had been in prison?

THE PROSPECTIVE JUROR: He served time, yes. He is out now.

[THE STATE]: Was it over drugs?

THE PROSPECTIVE JUROR: Yes, sir. Actually it was over the money that was involved with the drugs, money.

[THE STATE]: What happened? Do you know the underlying facts?

THE PROSPECTIVE JUROR: He didn't turn the money into who he was supposed to give it to. He left town with it.

ECF Nos. 29-15 at 32; 29-16 at 20.

Urenda-Bustos alleges that appellate counsel would have succeeded with a *Batson* claim on direct appeal because a side-by-side comparison of African-American venireperson Duncan-Briley with non-African-American venirepersons Barbara Perez and Michael Bujanowski, shows the pretextual nature of the state's explanations for striking Duncan-Briley (that she "had been arrested or charged with battery domestic violence" and "had a brother who had been in prison"). ECF No. 89 at 63. The record belies those assertions.

Unlike Duncan-Briley, Perez had no relatives in prison. Moreover, their criminal histories were categorically different. Duncan-Briley's brother had a criminal history that, similar to the charges against Urenda-Bustos, involved the proceeds from drug trafficking. Duncan-Briley's prior arrest for "battery domestic violence," bore some similarity to Urenda-Bustos's case because, on its face, it indicated violence in the context of a domestic circumstance. By contrast, Perez's criminal history arose from her nonpayment of a traffic ticket that came due while she was hospitalized for a traffic accident for which she received the ticket and for selling tobacco to a minor at the pool at the Mirage. ECF No. 29-16 at 24. Perez's failure to pay a traffic ticket due to her hospitalization was not disputed; therefore, it did not resemble the civil dispute between Urenda-Bustos and Gamboa-Cruz over who was responsible for payment of certain traffic tickets. ECF No. 29-16 at 24. Perez's criminal history was also far less serious than the criminal histories of Duncan-Briley and Duncan-Briley's brother. A side-by-side comparison between Duncan-Briley and Perez fails to yield an inference of discriminatory intent for the exercise of the peremptory challenge against Duncan-Briley.

The respondents contend that they struck a similarly situated prospective juror of another race, Michael Bujanowski, who, like Duncan-Briley, had a relative who served time in prison. ECF No. 78 at 32. The record does show that Bujanowski's cousin was a former deputy sheriff in

Florida who was serving time for actions alleged against the Sheriff, and that the state exercised a peremptory challenge to remove Bujanowski from the jury pool. ECF Nos. 29-2; 29-16 at 16. This side-by-side comparison undermines a finding that the peremptory challenge against Duncan-Briley was motivated by discriminatory intent.

Considering the totality of the relevant facts about the prosecutor's conduct as to Duncan-Briley, *Miller-El*, 545 U.S. at 239, including relevant factors set forth in *Flowers*, 588 U.S. at 301–02, i.e., the statistical record, *see supra*, p. 65–66, the comparative juror analysis, lack of disparate questioning, and the explanation that the criminal history of Duncan-Riley and her brother provided the basis for her removal, the trial court could reasonably conclude the explanation for exercising the peremptory challenge against Duncan-Riley failed to raise an inference of race discrimination in jury selection. Because a trial court's decision on the question of discriminatory intent is a finding of fact to be accorded great deference on appeal unless clear error, and the record fails to demonstrate purposeful discrimination in the challenge of venireperson Duncan-Riley, an objectively reasonable appellate attorney could conclude that the trial court's determination would be given deference and there was no clear error. *See Snyder*, 552 U.S. at 477. Thus, the state supreme court reasonably determined appellate counsel would not have succeeded with a claim that the trial court clearly erred in overruling the *Batson* objection for the state's peremptory challenge of African-American venireperson Duncan-Briley. Ground 3(B)(1) is denied.

> e.    *Ground 3(B)(2)—The Supreme Court of Nevada reasonably determined appellate counsel was not ineffective in failing to pursue a Batson claim as to the state's examination of venireperson Owens.*

At the start of jury selection, the trial court explained to the prospective jurors that the trial was expected to last three to five days. ECF No. 29-15 at 7. The trial court explained that if a prospective juror was excused from that jury panel, they would not be excused from jury service, but will return to the jury commissioner's office and be "thrown into another pool." *Id.* The trial court informed them that they would be "hard-pressed to find a case in this building that is going to take less time than this case," and warned, "if you want to get your jury service over with, don't be too quick to bail out." *Id.* The trial court explained that if a prospective juror has a childcare-scheduling conflict, the court will let the juror off this jury pool "this one time, but the next time

you need to make some arrangements to have somebody cover for you." *Id.* The trial court furthermore told the prospective jurors "if something is going on that is going to detract from your ability to be on the jury, and to concentrate and focus on what is going on, then I probably need to know about that." *Id.* at 7–8. The trial court reiterated, "Again, you won't get out of jury duty, you will just get enrolled into another jury pool." *Id.*

African-American venireperson Owens worked a graveyard shift and explained that, if he served on the jury, he lacked childcare for the first half of the day. ECF No. 29-15 at 10. The state examined Owens about his graveyard shift and childcare schedule, lack of sleep, and ability to concentrate, and asked if, given the option, he wished to remain in the jury pool or not, and Owens initially elected to continue with jury selection:

> [THE STATE]: Mr. Owens sitting in the front row, you mentioned that you work at night, right?
>
> THE PROSPECTIVE JUROR: Yes.
>
> [THE STATE]: Are you scheduled to work graveyard this week?
>
> THE PROSPECTIVE JUROR: Yes. I am off Friday and Saturday.
>
> [THE STATE]: And how do you think your work schedule will interfere with your ability to be on this jury?
>
> THE PROSPECTIVE JUROR: I don't get much sleep as it is when I am home with a baby. Either way it goes I will be up.
>
> [THE STATE]: Do you think you will have a problem—the Judge will probably go until 5 everyday, I think.
>
> Are you going to be able to get enough sleep to work?
>
> THE PROSPECTIVE JUROR: I will try my best to. If I am obligated, I am obligated.
>
> [THE STATE]: It is important that we have your full attention, obviously.
>
> THE PROSPECTIVE JUROR: You have it now.
>
> [THE STATE]: Do you think it would be—if you had your preference, would you rather be able to get your sleep and go to work or do your civic duty and be on the jury?
>
> THE PROSPECTIVE JUROR: It is important if I can give you my undivided attention, that I wouldn't be sleeping with somebody's life in the balance.

76

[THE STATE]: It sounds like it would be a distraction to you, difficult for to [sic] you give your full attention?

THE PROSPECTIVE JUROR: No. It depends on the individual. I am very focused.

When I am here. I am here. I will pay attention.

If I have to drink coffee or whatever I have to do to stay up, I will be here.

[THE STATE]: Now is your chance, if you rather go than stay, that's kind of my question?

THE PROSPECTIVE JUROR: Well, if I can go—

[THE STATE]: Will you go?

THE PROSPECTIVE JUROR: If I have got to go downstairs, I will stay right here.

ECF No. 29-16 at 20. Owens later opted for excusal so he could prearrange childcare and serve on a different jury:

THE COURT: One last question. You are the only other question mark, and you are Mr. Owens, right?

THE PROSECTIVE JUROR: Yes, sir.

THE COURT: Are you going to be able to do this? I want you to do this, because it is going to be a good case to get your jury service out of the way on.

I want to make sure that you are comfortable; are you going to be able to make arrangements to fulfill your jury service, because I don't want you to get stretched out, hammered.

I don't want you to get in a position where you really can't pay attention. If you can do all of the things, I want you here, but if you are going to get all strung out, I need to know.

As soon as I let the rest of these folks go, we are stuck.

THE PROSPECTIVE JUROR: If you were to let me go, would I have to come back tomorrow?

THE COURT: If I let you go, you are going to have to go down to the Jury Commissioner's office, and they are going to rotate you into another jury pool, not necessarily tomorrow, but not too far in the distant future.

THE PROSPECTIVE JUROR: They will send me another summons in the mail.

THE COURT: They will tell you to make arrangements about the child care issue.

THE PROSPECTIVE JUROR: I will make arrangements in the future so I don't have to worry about how my girlfriend is going to get this covered.

THE COURT: We will excuse you now. Next time [re]member, they roll you back into another jury pool, they wouldn't be listening [to] you say I didn't know I had to make arrangements.

THE PROSPECTIVE JUROR: I will already have them made.

THE COURT: Go down to the Jury Commissioner's office.

ECF No. 29-16 at 23–24.

Urenda-Bustos contends that although Owens was excused by the trial court, the state's examination evinced discriminatory intent by pressing to excuse Owens for "job related reasons" without doing so for a Hispanic juror, Maria Cariaso, who raised employment scheduling complications. ECF Nos. 52 at 64–65; 89 at 64. Assuming arguendo that the state's examination of Owens without exercising a peremptory challenge to excuse Owens could provide a basis for prevailing on a claim under *Batson*, a reasonable trial court could conclude that the record fails to demonstrate discriminatory intent. The trial court could reasonably conclude the examination of Owens by the state and the trial court demonstrate the examination of Owens was motivated by a legitimate concern that, after working graveyard shift all night, and due to his childcare concerns, Owens might be unable to concentrate during the trial, which was to be held during the daytime when he would ordinarily be taking care of a child and sleeping.

A side-by-side comparison of Owen's employment and childcare scheduling conflict with the employment circumstances of Filipino venireperson Maria Cariaso, could be construed by the trial court as failing to weigh in favor of a discriminatory intent during the examination of Owens:

THE PROSPECTIVE JUROR: I am currently working for the State of Nevada Department of Child and Family Services; however, I am doing a lateral transfer tomorrow effectively to the Department of Corrections.

I am only given 72 hours to make up my mind if I want to stay with the Department of Corrections or stay with the Department of Child and Family Services.

THE COURT: When is your transfer?

THE PROSPECTIVE JUROR: Tomorrow, effective tomorrow.

I am Maria Cariaso, number 052.

THE COURT: Thank you.

Do they know you are here or here on jury duty?

78

1    THE PROSPECTIVE JUROR: Yes.

2    THE COURT: Who is your supervisor?

3    THE PROSPECTIVE JUROR: The supervisor for the Department of Child and
     Family Services is Mary Haig.

4

5    THE COURT: The law in regards to employment and the employer's relationship
     to employees on jury duty applies to everybody.

6         They can't do anything adverse to you for serving on a jury.

7         The penalty are [sic] horrendous. They apply whether it is a public
     employee or a private employee.

8

9         There are huge penalties. In your situation, it is not that that [sic] you are
     going to suffer adverse consequences, you are in the middle of a transfer, and it is
     going to interfere with your ability to transfer, and to know whether you are going

10   to transfer.

11        There's going to be 31 people over in this pool, and only 13 are going to
     end up on the jury. There's going to be a lot of people left over.

12

13        Your chances of being on the jury aren't great. That's not really a legitimate
     excuse to get off of jury duty in this case.

14        But we will have a break, and you will need to call your supervisor and
     actually get a very specific picture of what happens if you are on jury duty during

15   that period, that window of time where you have a choice to stay or not, will they
     extend it.

16        Do you get to show up after you are off jury duty, if they will do that, then

17   you wouldn't suffer any potential consequences at all.

18        So let's wait, and when we have a break, you can call your supervisor, and
     come back and tell us what she said.

19

20        They will extend that time period so you have time after you physically
     show up at the Department of Corrections.

21        Do you know which Department of Corrections you are going to be

22   assigned?

23   THE PROSPECTIVE JUROR: Indian Springs.

24   ECF No. 29-15 at 10. The trial court later followed up and Cariaso explained that she had not heard

25   back from her supervisor but the Nevada Department of Corrections instructed her to contact them

26   as soon as the jury duty is over, and the trial court stated it would personally call about modifying

27   the policy if necessary but anticipated no problem:

28        THE COURT: Maria—

79

1   THE PROSPECTIVE JUROR: Cariaso.

2   THE COURT: —Cariaso.

3   We know a little bit. You already told us about your background.

4   How long have you been here?

5   THE PROSPECTIVE JUROR: 11 years.

6   THE COURT: And where are you going?

7   THE PROSPECTIVE JUROR: The Department of Corrections by Indian Springs.

8   THE COURT: Did you call your—

9   THE PROSPECTIVE JUROR: I left a message.

10   I have not received a call back yet.

11   THE COURT: I would even talk to—I was thinking about it later, it is probably the
12   supervisor over at the NDOC that you would probably want to find out from.

13   THE PROSPECTIVE JUROR: They are aware that I am having jury duty. They
   told me that as soon as the duty is over just to call. They are given 72 hours.

14   THE COURT: To make up your mind?

15   THE PROSPECTIVE JUROR: Yes.

16   THE COURT: We will see. Let's play this out and see how it goes, which is
17   anticipated that you don't have a problem.

18   If it turns out that you actually are on this jury and there's going to be an
   issue, I will personally call whoever I need to call to see if they will modify the
19   policy enough so that you can have a chance to serve on the jury without losing
   your opportunity to still make that decision.

20   THE PROSPECTIVE JUROR: Okay.

21   THE COURT: Is that all right.

22   THE PROSPECTIVE JUROR: Thank you.

23   ECF No. 29-16 at 12–13.

24   Unlike Owens, the state did not voir dire venireperson Cariaso; however, Cariaso did not

25   disclose any conflicts that would compromise her physical ability to concentrate on the

26   presentation of evidence. Moreover, Cariaso never reached a point where she might be selected to

27   serve on the jury. Considering the totality of the relevant facts about the prosecutor's conduct,

28   *Miller-El*, 545 U.S. at 239, including relevant factors set forth in *Flowers*, 588 U.S. at 301–02, i.e.,

the statistical record, comparative juror analysis, lack of disparate questioning, that Owens chose to leave the jury pool for his own personal reasons, and the state's examination of Owens was focused on legitimate concerns about Owens's ability to obtain sufficient rest to concentrate on the evidence at trial, the trial court could reasonably conclude the state's examination of Owens was not motivated by discriminatory intentions and did not support a finding of purposeful discrimination in jury selection. *See Ervin*, 12 F.4th at 1107–08; *McDaniels*, 813 F.3d at 778–79. As stated above, a trial court's decision on the question of discriminatory intent is a finding of fact to be accorded great deference on appeal unless clear error. *See Snyder*, 552 U.S. at 477. The record supports a finding that the trial court credited the state's explanations for its examination of Owens and the state supreme court was reasonable in its application of *Strickland* and determination that appellate counsel would not have succeeded with a *Batson* claim with respect to African-American venireperson Owens. Ground 3(B)(2) is denied.

> f.  *Ground 3(B)(3)—The Supreme Court of Nevada reasonably determined appellate counsel was not ineffective in failing to pursue a Batson claim as to venireperson Hill.*

African-American venireperson Hill stated he would "probably not" keep an open, neutral objective frame of mind while listening to the evidence because he would be thinking about the income he was losing from his job parking cars at Bellagio. ECF No. 29-15 at 19. Hill later opted to be released after the trial court determined there were sufficient jurors in the jury pool:

> THE COURT: Mr. Hill?
>
> THE PROSPECTIVE JUROR: Yes.
>
> THE COURT: I told you at the beginning, you are the only one that identified a real specific serious economic issue. I told you if we had enough folks when we got to the end, I would go ahead and let you go. Do you want me to let you go or do you think you can stick this out?
>
> THE PROSPECTIVE JUROR: Why don't you let me go.
>
> THE COURT: Mr. Hill, thank you for participating. I appreciate it.

ECF Nos. 29-15 at 19; 29-16 at 22.

As with Owens, Urenda-Bustos contends that, although Hill was excused by the trial court, the state pressed to excuse Hill for "job related reasons" but did not do so for Cariaso. ECF No. 89

at 64. Hill's voluntary excusal from the jury pool cannot be construed as evidence that the state engaged in purposeful discrimination. The state did not individually voir dire Hill and the record is bereft of any indication that the state sought Hill's excusal from the venire. The state supreme court's application of *Strickland* and determination that appellate counsel would not have succeeded with a *Batson* claim for African-American venireperson Hill, is objectively reasonable. Ground 3(B)(3) is therefore denied.

> g. **Ground 3(B)(4)—The Supreme Court of Nevada's application of Strickland and determination that appellate counsel was not ineffective in failing to pursue a Batson claim as to the state's peremptory challenge of venireperson Nock is, by clear and convincing evidence in the state court record, based on an unreasonable determination of fact, and appellate counsel was ineffective in failing to pursue the claim.**

Urenda-Bustos alleges the state court's record and a comparative-juror analysis establish the state's two reasons for exercising the peremptory challenge against venireperson Nock—one based on Nock's demeanor and the other because she was a fan of the television program called "CSI" (Crime Scene Investigation)—were pretextual. ECF Nos. 52 at 65–66; 89 at 61–65. He contends the state supreme court's rejection of his appellate-counsel-ineffectiveness claim is based on an unreasonable determination of fact. *Id.* The respondents contend the state supreme court's application of *Strickland* was reasonable. ECF No. 78 at 31–32. For the reasons discussed below, this court finds there is clear and convincing evidence in the state court record establishing that the state supreme court's determination that Urenda-Bustos was not prejudiced by appellate counsel's failure to pursue the *Batson* claim as to venireperson Nock is based on an objectively unreasonable determination of fact in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(2) and (e)(1). And on de novo review, the court concludes that appellate counsel rendered ineffective assistance under *Strickland* in failing to pursue the challenge to the trial court's decision overruling the *Batson* objection as to venireperson Nock.

In 2008, the Supreme Court determined on direct appeal in *Snyder* that a trial court clearly erred in overruling a *Batson* objection. *See Snyder*, 552 U.S. at 474. In *Snyder*, the state excused all of the African-American venirepersons, and the Supreme Court considered the state's two proffered race-neutral reasons for its peremptory challenge for just one of those venirepersons: (1)

the venireperson's demeanor, i.e., the juror "looked nervous" throughout the proceeding; and (2) conflicts with the venireperson's schedule that might incite the juror to rush a verdict. *See id.* at 478. Defense counsel disputed the justifications, and the trial court overruled the *Batson* objection, stating, "All right. I'm going [to] allow the challenge. I'm going to allow the challenge." *See id.* at 479. The state supreme court on direct appeal deferred to the trial court's ruling rejecting the *Batson* objection on the grounds that, "nervousness cannot be shown from a cold transcript, which is why . . . the [trial] judge's evaluation must be given much deference." *See id.*

The Supreme Court explained in *Snyder* that a trial court's first-hand observations are of greater importance when the prosecutor's race-neutral reasons for peremptory challenges "invoke a juror's demeanor (e.g., nervousness, inattention)." *See Snyder*, 552 U.S. at 477. In such situations, "[t]he trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id.* "[D]eterminations of credibility and demeanor lie 'peculiarly within a trial judge's province,'" and "in the absence of exceptional circumstances," deference is given to the trial court. *Id.* (internal quotations and citations omitted).

The Supreme Court acknowledged that deference is "especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike"; however, in *Snyder*, the Supreme Court stated that it could not be presumed that the trial court credited the prosecutor's demeanor-based justification because the trial court did not specify which of the state's two explanations were relied upon for overruling the *Batson* objection. *See Snyder*, 552 U.S. at 479. The Supreme Court reasoned that the trial court's ruling to "allow the challenge" made it impossible to determine whether the trial court had any impression one way or the other concerning the juror's demeanor, and it was possible the trial court based its ruling, not on the demeanor-based justification, but on the second proffered justification for the strike. *See id.* The Supreme Court went on to determine in *Snyder* that the state's second justification for striking the venireperson lacked credibility and gave rise to an inference of discrimination because the record showed the scheduling issue was resolved during jury selection and a comparative analysis

revealed the state failed to excuse two non-African-American venirepersons who likewise had scheduling problems that posed serious consequences if they served on the jury. *See id.* at 479–85.

Because in *Snyder*, there was no support in the record for either of the state's proffered race-neutral reasons for eliminating the venireperson, and because the record did not show the prosecution would have presumptively challenged [that venireperson] based on his nervousness alone, the Supreme Court in *Snyder* concluded the state's proffer was pretextual and the exercise of the peremptory challenge gave rise to an inference of discriminatory intent. *See Snyder*, 552 U.S. at 485–86. And the Supreme Court explained that the case ordinarily might be remanded for further proceedings; however, given that over a decade had passed since the trial, there was no realistic possibility that remand would be profitable, so the Supreme Court reversed the judgment. *See id. Accord Reynoso v. Hall*, 395 F. App'x 344, 348–51 (9th Cir. 2010) (holding petitioners entitled to federal habeas relief where prosecutor's first reason for using challenge against juror, i.e., her lack of education, was belied by comparative-juror analysis, and the trial court failed to evaluate the second reason based on the juror's demeanor, i.e., that the juror was inattentive). *Cf. Briggs v. Grounds*, 682 F.3d 1165, 1177 (9th Cir. 2012) (holding where state gave two explanations, including one concerning demeanor, and the trial court did not make a specific finding on the demeanor-based justification, a *Batson* claim could be rejected if the second explanation for excusing the venireperson was not pretextual). *Compare Thaler v. Haynes*, 559 U.S. 43, 44–49 (2010) (holding where the state offers only a demeanor-based explanation for challenging a venireperson, a trial court need not personally observe and recall the demeanor in ruling on a *Batson* objection).

As discussed, in Urenda-Bustos's case, the state supreme court determined there is no reasonable probability appellate counsel could have successfully appealed the trial court's decision to overrule the *Batson* objection to the peremptory challenges against the African-American venirepersons, including Nock, because the trial court credited the prosecutor's race-neutral reasons for exercising the peremptory challenges. ECF No. 31-27 at 7. The state supreme court's determination is based on an unreasonable determination of fact because clear and convincing

1   evidence in the record establishes it cannot be presumed the trial court credited the state's

2   demeanor-based justification for peremptorily excusing Nock.

3         Similar to the prosecution in *Snyder*, the state here offered two race-neutral reasons for its

4   peremptory challenge of Nock: (1) she was a fan of the television show CSI; and (2) her body

5   language was poor in that she did not laugh during the lighter moments during jury selection and

6   had a scowl on her face throughout the proceedings. *See supra* p. 67–68. The defense argued these

7   justifications were pretextual because other prospective jurors indicated they watched CSI and did

8   not laugh during the jury selection. *Id.* The trial court overruled the *Batson* objection, stating it did

9   not "find that there has been any abuse of challenges," did not find "there has been a violation

10  here," and did not find "there's any reason to declare a mistrial here and start over." *Id.* at 68–69.

11        All fairminded jurists would agree that there is clear and convincing evidence in the state-

12  court record that belies a finding that the trial court credited the state's demeanor-based

13  justification for peremptorily striking African-American venireperson Nock. As in *Snyder*, the trial

14  court made no findings concerning Nock's demeanor and expressed no reliance on that

15  justification as distinct from the state's second CSI-based justification for striking the

16  venireperson. Consequently, the state supreme court's determination that the trial court credited

17  the state's race-neutral explanation based on Nock's demeanor is an unreasonable determination

18  of fact in light of the evidence presented in the state court's record of proceedings.

19  28 U.S.C. § 2254(d)(2), (e)(1).[26] Accordingly, this court will evaluate de novo the claim that

20  appellate counsel was ineffective in failing to raise a *Batson* claim on appeal. *Hurles v. Ryan*, 752

21  F.3d 768, 778 (9th Cir. 2014) (citing *Cullen*, 563 U.S. at 185).

22        The court finds that appellate counsel provided ineffective assistance in violation of the

23  Sixth and Fourteenth Amendments. Appellate counsel's failure to pursue a claim that the trial court

24  clearly erred in overruling the *Batson* objection for venireperson Nock fell below an objective

25  standard of reasonableness. At the time of Urenda-Bustos's direct appeal, the Supreme Court had

---

26        [26] This court notes that the state supreme court unreasonably relied on *Hawkins*, 127 Nev. at 579, 256 P.3d

27  at 968. ECF No. 31-27. *Hawkins* is irrelevant to the analysis in Urenda-Bustos's case as the state's explanation for its use of peremptory challenges in *Hawkins* was not based on the challenged juror's demeanor; rather it was based on

28  the juror being a college professor. *Hawkins*, 127 Nev. at 577, 256 P.3d at 968. Moreover the defendant in *Hawkins* failed to object to the peremptory challenge at trial. *Id.*

1   already held on direct review in *Snyder* that a trial court's rejection of a *Batson* objection was

2   clearly erroneous where, as here, the trial court made no determination regarding the state's

3   demeanor-based justification and the state's second justification for excusing a juror was

4   implausible based on the record of proceedings. *See supra* pp. 82–85; ECF Nos. 29-25; 29-26.[27]

5       The topic of the television show CSI and related television programs was raised only twice

6   during the entire jury selection: (1) during the trial court's questioning of non-African-American

7   juror Ryan Tapper, and (2) during the state's questioning of African-American venireperson Nock.

8   ECF Nos. 29-15 at 28; 29-16 at 19. The trial court questioned 18-year-old Tapper whether he

9   watched court-related television shows, and elicited Tapper's acknowledgment that he

10  occasionally watched the television show entitled "Law & Order"; that he was familiar with the

11  television show CSI; that he was aware that CSI was set in Las Vegas, Nevada; and that Tapper

12  agreed television is scripted and has no relevance to Urenda-Bustos's trial proceedings:

13      THE COURT: You have never been on a jury, I am sure that's what you said.

14      [JUROR TAPPER]: Yes.

15      THE COURT: Do you understand how these things work; do you watch TV?

16      [JUROR TAPPER]: Yes.

17      THE COURT: Do you watch Law and Order?

18      [JUROR TAPPER]: Occasionally.

19      THE COURT: Do you watch any of those TV shows where there are trials and all
20      of that stuff?

21      [JUROR TAPPER]: Yes.

22      THE COURT: Which ones?

23      [JUROR TAPPER]: Law and Order, number 1.

24      THE COURT: You know that they write those stories?

25      [JUROR TAPPER]: Yes.

---

26  [27] The supreme court in Nevada had also previously advised state trial courts to "clearly spell out the three-
27  step analysis" when conducting a *Batson* analysis. *See Kaczmarek v. State*, 120 Nev. 314, 334 (2004) ("We have
    directed Nevada's district courts to 'clearly spell out the three-step analysis' when deciding *Batson*-type issues."). *See*
28  *also Libby v. State*, 115 Nev. 45, 54 (1999) ("We take this opportunity to instruct the district courts of this state to
    clearly spell out the three-step analysis when deciding a *Batson* . . . issue.").

1    THE COURT: Do you watch NCIS [originally titled "Naval Criminal Investigative Service"]?

2    [JUROR TAPPER]: No.

3    THE COURT: What is the one for Las Vegas?

4    [JUROR TAPPER]: CSI.

5    THE COURT: Just in case you are expecting to see somebody find the hair of a mule on a horse's rear, it doesn't work like that.

6

7             These aren't scripted like what you see on TV.

             What happens here doesn't have much relevance, would you agree with

8    that?

9    [JUROR TAPPER]: Yes.

10   ECF No. 29-15 at 28.

11        Later that day, the state addressed the venire as a whole and raised the topic of television

12   shows like CSI. ECF No. 29-16 at 19. The state elicited "no hands" in response to a query whether

13   "anyone" had "a problem separating the reality of this trial from the entertainment of the fantasy

14   of TV." *Id.* The state then questioned only venireperson Nock whether anything she may have seen

15   on the CSI television show would affect her deliberation, and Nock confirmed it would not:

16       [THE STATE]: This is a general observation. The Judge touched on it, I think, with one or 2 of you, the idea of the show CSI was very popular. It is still on the air, and

17       NCIS involves criminal analysis.

18             There is [sic] a lot of shows about crime and about lawyers, and trials.

19             It is very important that we understand and are able to separate the realty [sic] of what is going to happen in this trial, and the reality of what police work is,

20       and the fantasy and the entertainment value that we see on TV.

21             And, for example, a lots [sic] times after a trial happens, we will talk to the jurors afterwards, and they will ask about; why didn't the police do this, that or the

22       other, and the answer is; well that technology doesn't exist.

23             The stuff on TV is very entertaining, but it just doesn't exist. Is there anyone who is going to have a problem, or is there anyone who is going to say after the

24       fact, one time I saw on CSI they are able to do that, and the cops in this case didn't do it, so he is not guilty.

25

26             Does anyone have a problem separating the reality of this trial from the entertainment of the fantasy of TV?

27             No hands.

28

                                              87

The thing about CSI, every case they send out 4 or 5 guys to look at the forensic evidence.

Can anyone think of a case where you might not send anyone out for CSI, or why in a certain case it might not be as important.

For this, Ms. Nock, I think you said that you were a fan of those shows?

[VENIREPERSON NOCK]: Um-hum.

[THE STATE]: Do you think of a reason why you might not do a crime scene analysis in a particular case?

[VENIREPERSON NOCK]: Say that again.

[THE STATE]: Can you think of a reason why you might not need forensic evidence in a particular case?

[VENIREPERSON NOCK]: No.

[THE STATE]: It makes sense that maybe not every case calls for it.

[VENIREPERSON NOCK]: True.

[THE STATE]: Not every case needs DNA analysis. Not every case needs 5 guys from the crime scene analyst's team out there.

So, again, getting back to what is reasonable, what is possible in forensic science versus what is entertaining on TV, so that may or may not, or that may be an issue in the case.

You are not one of the people who is going to come back and say; well, I saw it on CSI. I didn't see it in the case, so I found one way or the other; are you?

[VENIREPERSON NOCK]: No.

ECF No. 29-16 at 19.

Just before the state questioned Nock, no one in the venire, including Nock, raised their hand when the state asked whether anyone in the venire could not separate reality from television. Yet the state directly questioned only African-American venireperson Nock concerning CSI and NCIS and related television shows. And, although non-African-American venireperson Tapper acknowledged under questioning by the trial court that he was familiar with CSI and offered that CSI was set in Las Vegas (where Urenda-Bustos was on trial), the state did not follow up by questioning Tapper about whether he watched CSI, was a fan of that show, or whether Tapper could think of reasons why a case might not require a forensic team. An objectively reasonable appellate attorney would have realized that the record reflects the state's disparate questioning of

88

1   African-American venireperson Nock raises an inference of racial discrimination in the jury

2   selection. *See Flowers*, 588 U.S. at 301–02 (citing *Miller-El*, 537 U.S. at 331–332, 344–45).

3   Moreover, an objectively reasonable appellate attorney would have concluded that a side-

4   by-side comparison with the only similarly-situated venireperson, Tapper, raises an inference of

5   racial discrimination in the exercise of the peremptory challenge of venireperson Nock. *Flowers*,

6   588 U.S. at 301–02 (citing *Snyder*, 552 U.S. at 483–484; *Miller-El*, 545 U.S. at 241). The state's

7   concern whether Nock's verdict night be influenced by what is depicted on television was negated

8   by Nock's agreements with the prosecutor that not every case requires forensic evidence (even

9   though the state presented DNA evidence in Urenda-Bustos's case), and Nock would not base her

10  verdict on television programming that differs from the state's evidence. Nock and Tapper each

11  stated they could separate fact from fiction, and Nock stated that her verdict would not be

12  influenced by television shows, yet the state excused African-American venireperson Nock and

13  did not excuse non-African-American venireperson Tapper, who gained a seat on the jury. ECF

14  No. 29-13 at 2.

15  Another relevant circumstance that undermines the state's justification is the state's

16  complete failure to question Nock concerning the other justification for excusing her, i.e., her

17  demeanor. *See Flowers*, 588 U.S. at 301–02; *Miller-El*, 545 U.S. at 246 (["]"[T]he State's failure

18  to engage in any meaningful voir dire examination on a subject the State alleges it is concerned

19  about is evidence suggesting that the explanation is a sham and a pretext for discrimination[.]").

20  Under the circumstances, there is no reasonable strategic basis for appellate counsel's

21  failure to pursue the *Batson* claim on appeal. Rather, all objectively reasonable appellate attorneys

22  would have raised a claim on direct appeal that the trial court clearly erred in overruling the *Batson*

23  objection for the excusal of African-American venireperson Nock and would have argued the trial

24  court's ruling was clear error based on the reasoning in *Snyder*. Moreover, given the record here

25  and the Supreme Court's ruling in *Snyder*, there is a reasonable probability that appellate counsel

26  would have succeeded with a claim that the trial court clearly erred in overruling the *Batson*

27  objection as to venireperson Nock. At the very least, the appeal would have resulted in a remand

28  for an evidentiary hearing to determine whether the trial court relied on Nock's demeanor for its

decision to overrule the *Batson* objection. *Snyder*, 552 U.S. at 485–86. Appellate counsel's failure to pursue a claim that the trial court erred in overruling the *Batson* objection to the state's peremptory challenge of venireperson Nock constitutes ineffective assistance of appellate counsel under *Strickland* and the writ will be granted based on the claim raised in ground 3(B)(4). *Smith*, 528 U.S. at 285–86.

> 5.    *Ground 3(C)—The Supreme Court of Nevada was reasonable in its application of Strickland and determination that appellate counsel was not ineffective in failing to raise a claim that the evidence seized from Urenda-Bustos's residence should have been suppressed because its seizure was based on a pretextual warrant.*

The state supreme court reasonably rejected Urenda-Bustos's assertion that appellate counsel was ineffective for failing to raise the claims in grounds 2(A) and 2(B). ECF No. 31-27 at 7. The state supreme court's determination and application of *Strickland* are reasonable for the reasons discussed in Grounds 2(A) and 2(B), as an objectively reasonable attorney could determine the claims lack merit and therefore there is no reasonable probability the claims would have succeeded if raised on appeal. *See supra* pp. 11–21. Ground 3(C) is denied.

> 6.    *Ground 3(E)—The Supreme Court of Nevada was reasonable in its application of Strickland and determination that appellate counsel was not ineffective in failing to raise a claim that the state's questioning of trial witnesses elicited inadmissible evidence.*

The state supreme court's application of *Strickland* and determination rejecting this claim are objectively reasonable. ECF No. 31-27 at 7. For the reasons discussed in ground 2(E), *see supra* pp. 24–40, an objectively reasonable appellate attorney could conclude none of the questions identified were objectionable, and even if objectionable and the testimony that was elicited inadmissible, there is no reasonable probability the result of the proceedings would have been different, given Urenda-Bustos's confession, the CD of his voicemail to Cadena-Ambario, the testimony of witnesses who saw Cadena-Ambario's injuries, and the evidence seized from Urenda-Bustos's residence, car, and Lopez-Lauro's minivan. Ground 3(E) is denied.

> 7.    *Ground 3(G)—The Supreme Court of Nevada was reasonable in its application of Strickland and determination that appellate counsel was not ineffective in failing to seek reversal on the grounds that Jury Instruction 13, and the state's corresponding closing remarks, unlawfully permitted the jury to convict Urenda-Bustos for kidnapping and extortionate collection of*

*debt based on an unlawful natural-and-probable-consequences theory of coconspirator liability.*

The state supreme court's application of *Strickland* and determination that appellate counsel was not ineffective in raising this claim on direct appeal is objectively reasonable. ECF No. 31-27 at 7. There is no reasonable probability the result of the proceedings would have been different, given Urenda-Bustos's confession, the CD of his voicemail to Cadena-Ambario, the testimony of witnesses who saw Cadena-Ambario's injuries, and the evidence seized from Urenda-Bustos's residence, car, and Lopez-Lauro's minivan. And, as explained in the analysis of ground 2(I), *see supra* pp. 50–55, Urenda-Bustos conceded his guilt for the specific intent crimes of conspiracy to commit kidnapping, kidnapping, and extortionate collection of debt, leaving only general intent crimes for which conspiracy was not alleged as a theory of liability. See ECF No. 29-22 at 4–9. The "natural and probable consequences" language contained in Jury Instruction 13 is only improper when the crime at issue is a specific-intent crime. *See Sharma v. State,* 118 Nev. at 654. Robbery is, however, a general-intent crime. *Hancock,* 80 Nev. at 583. The Supreme Court of Nevada has held that where an instruction properly referenced the "natural and probable consequences" doctrine in relation to a general intent crime, appellate counsel's failure to challenge the instruction does not amount to ineffective assistance because the trial court, in that circumstances, does not abuse its discretion in giving the instruction. *Turner*, 133 Nev. 1084. Ground 3(G) is denied.

> **B.**    *The Supreme Court of Nevada's application of Strickland and determination that trial and appellate counsel's representation, as a whole, was not ineffective, is objectively reasonable, except as to ground 3(B)(4).*

Although claims of ineffective assistance of counsel are examined separately to determine whether trial counsel was deficient, *Strickland* instructs that the purpose of the Sixth Amendment's guarantee to counsel "is simply to ensure that criminal defendants receive a fair trial" and "that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 689. The performance inquiry must be whether counsel's assistance was reasonable *considering all the circumstances. Id.* at 692 (emphasis added). *See also Boyde*, 404 F.3d at 1176 ("prejudice may result from the cumulative impact of multiple deficiencies.") (quoting *Cooper*, 586 F.2d at 1333). In *Browning v. Baker*, 875 F.3d 444 (9th Cir. 2017), the ninth

circuit court of appeals held, "[w]hile an individual claiming IAC 'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,'" the court "considers counsel's conduct as a whole to determine whether it was constitutionally adequate." *Id.*

On consideration of the merits of the IAC claims as a whole, and assuming the procedural defaults of some of the IAC claims could be overcome, the court concludes Urenda-Bustos does not show that, on the whole, taking into consideration trial counsel's deficient performance in failing to object to Jury Instruction 13 (ground 2(I)), that trial counsel's actions or omissions were deficient and prejudicial such that Urenda-Bustos was denied a fair trial. Insofar as appellate counsel's representation, the court concludes that aside from appellate counsel's ineffective assistance for ground 3(B)(4), Urenda-Bustos has not demonstrated that, on the whole, appellate counsel's actions or omissions were deficient and prejudicial. Thus, Urenda-Bustos has not demonstrated he received constitutionally inadequate assistance from trial counsel and appellate counsel apart from ineffective assistance in connection with ground 3(B)(4).

IV.     Certificate of Appealability

This is a final order adverse to Urenda-Bustos. Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability ("COA"). This court therefore has sua sponte evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under § 2253(c)(2), a COA may issue only when the petitioner has made "[a] substantial showing of the denial of a constitutional right[.]" With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying this standard, a certificate of appealability is warranted for grounds 2(A)–2(C) and 3(B)(1)–(3). *See Slack*, 529 U.S. at 484.

V.     Conclusion

The state supreme court's determination that the trial court credited the prosecutor's race-neutral justification for exercising a peremptory challenge for venireperson Nock is based on an

92

unreasonable determination of fact in light of clear and convincing evidence presented in the state court's proceedings. 28 U.S.C. § 2254(d)(2), and (e)(1). And, appellate counsel's failure to pursue the claim that the trial court erred in overruling the *Batson* objection to the state's exercise of a peremptory challenge against venireperson Nock constitutes ineffective assistance of appellate counsel given the ruling in *Snyder* and the state court's record. Due to the failure to make requisite factual findings, and the passage of more than a decade since trial, there is no realistic possibility the question whether the state engaged in purposeful discrimination in jury selection could be profitably explored on remand. *See Snyder*, 552 U.S. at 485–86. Thus, the judgment is vacated, and the matter reversed and remanded for a new trial based on the claim raised in ground 3(B)(4).[28]

It is therefore ordered that the fourth amended petition (ECF No. 52) is conditionally GRANTED on ground 3(B)(4). The state court's judgment of conviction of Petitioner Luis A. Urenda-Bustos in Case No. C267884-1 in the Eighth Judicial District Court of Nevada is hereby vacated. The petitioner is ordered released from custody within 30 days of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of this court's judgment, if affirmed, or (2) the expiration for seeking such appeal or review, unless the state files a written election in this matter within the 30-day period to retry Urenda-Bustos and thereafter commences jury selection in the retrial within 120 days following the election to retry Cardenas, subject to reasonable request for modification of the time periods in the judgment by either party pursuant to Rules 59 and 60.

It is further ordered that grounds 2(A)–2(J), 3(A), 3(B)(1)–(3), 3(C), 3(E), and 3(G) are denied and grounds 3(D) and 3(F) are dismissed as procedurally defaulted.

It is further ordered that all requests for an evidentiary hearing are DENIED.

It is further ordered that a certificate of appealability is GRANTED for ground 2(A)–2(C) and 3(B)(1)–(3) and denied for all other grounds of the petition. Reasonable jurists would additionally not find the court's dismissal of grounds 3(D)and 3(F) debatable, or wrong and reasonable jurists would not find it debatable whether this Court was correct in its procedural ruling

---

[28] The court notes that the parties made several arguments and cited to several authorities not discussed above. The court has reviewed these arguments and authorities and determines that they do not warrant discussion as they do not affect the outcome of the claims before the court.

dismissing ground 1 as procedurally defaulted as stated in this court's order granting the motion to dismiss the fourth amended petition (ECF No 67).

It is further ordered that the clerk of court is further directed to (1) substitute Ronald Oliver for Respondent Jerry Howell; (2) enter judgment accordingly; (3) provide a copy of this order and the judgment to the Clerk of the Eighth Judicial District Court of Nevada in connection with that court's case number C267884-1; and (4) close this case.

DATED September 6, 2024.

JAMES C. MAHAN
UNITED STATES DISTRICT JUDGE

94